GREGORIA RIVERA, ETC., demandantes y recurridos, *v.* ESTADO LIBRE ASOCIADO DE PUERTO RICO, demandado y recurrente.

*Número:* R-69-337       *Resuelto:* 6 de mayo de 1971

*Gilberto Gierbolini, Procurador General, Dolores Ruiz de Zambrana* y *Ruth Tentori de Lebrón Velázquez, Procuradoras Generales Auxiliares,* abogados del recurrente; *Raymundo Suárez Lazú* y *Luis E. Gandía Argüelles,* abogados de los recurridos.

EL JUEZ ASOCIADO SEÑOR RAMÍREZ BAGES emitió la opinión del Tribunal.

Debemos determinar si la muerte del causante de los recurridos fue causada por una omisión negligente del personal médico del Hospital de Distrito de Fajardo de la recurrente. El tribunal de instancia concluyó que dicha muerte se debió a esa negligencia. Además se impugnan por excesivas las cuantías de daños concedidas a cada uno de los recurridos.

Concluimos que el personal médico de la recurrente pudo haber cometido un error de juicio al no descubrir a tiempo la afección de apendicitis del paciente en este caso pero no fue negligente en el tratamiento y exámenes que dieron lugar al diagnóstico de la afección renal que el paciente también padecía.

Concluyó el tribunal de instancia que:

"3—Juan Pastor Rivera [causante de los demandantes] había padecido por espacio de un año con anterioridad a la fecha de su muerte, de cálculos en la vejiga, habiendo sufrido varios episodios de este padecimiento. El 28 de octubre de 1963 enfermó, presentando un cuadro de severo dolor en el lado derecho del bajo vientre; se le encogió la pierna derecha"; que tenía fiebre, sufrió diarreas, su vientre estaba muy sensitivo, le producía dolor el palpar el abdomen (*rebound tenderness*); que en este estado fue conducido por su esposa al Centro de Salud de Canóvanas ese mismo día, en donde le dieron algunas medicinas para ser administradas en su hogar; (1)

"4—el día siguiente, el 29 de octubre de 1963, su estado físico y patólogico permaneció inalterado, y tuvo que ser conducido nuevamente al mismo Centro de Salud"; que entonces allí instruyeron a su esposa para que lo trasladara al día siguiente al Hospital de Distrito de Fajardo, para lo que le gestionaron la documentación necesaria.

"5—Luego de una noche de intenso padecer, bajo el mismo

---

(1) Esta conclusión se basa en el testimonio de la viuda de Pastor Rivera.

cuadro de síntomas, en la mañana del día 30 de octubre de 1963, fue ingresado en el Hospital de Distrito de Fajardo, controlado por el demandado y sus agentes, quienes atendieron a este paciente en ejercicio de sus funciones como tales"; que el récord de admisión señala al paciente con los síntomas ya descritos, y con el historial mencionado, y lo describen en estado crítico, *"acute distress"*; que su diagnóstico en esta ocasión fue *"lithiasis renal"* y pielonefritis crónica; que se sostuvo bajo este diagnóstico inalterado hasta el día 5 de noviembre de 1963, no obstante no operase mejoría alguna; que en esta fecha última, a la 1:00 de la tarde se dispuso una intervención quirúrgica de emergencia la que se llevó a cabo esa misma tarde; que esta intervención quirúrgica, descubrió un estado agudo de peritonitis debido a la perforación del apéndice; que la peritonitis resultó ser de tal grado, que no pudo el cirujano localizar el apéndice completo, sino únicamente residuos necróticos.

"6—Juan Pastor Rivera falleció en el referido Hospital de Distrito de Fajardo, el día 6 de noviembre de 1963 a las 10:00 de la mañana, como resultado de una aguda y difusa peritonitis, producto de una perforación del apéndice en efecto durante prolongado período."

Concluyó el tribunal sentenciador que:

"9—Se infiere que el fallecimiento de este paciente fue la consecuencia de una omisión negligente del personal médico de esta institución que lo tuvo bajo su observación, atención y cuidado por espacio de cinco días. Consistió esta omisión en no seguir la norma aceptada en la práctica de la medicina en esta localidad, de efectuar diagnósticos diversos y emprender un proceso de eliminación mediante exámenes conocidos y prevalecientes, cuando acontece una continuidad en un cuadro patológico perseverante. *Pérez* v. *E.L.A.*, 95 D.P.R. 745 (1968). El período de tiempo que estuvo resistiendo el paciente, bajo la atención y cuidado del personal

médico de este hospital, de haberse adoptado la norma señalada, esto habría logrado un diagnóstico y un tratamiento eficaz para evitar la extensa y virulenta difusión de la peritonitis y el subsiguiente fallecimiento de la víctima. Aquí puede decirse, parafraseando a *Pérez* v. *E.L.A.*, supra, que el paciente le dio oportunidad a los médicos, pero los médicos no se la dieron a él."

Dicho tribunal dictó sentencia condenando al Estado Libre Asociado a pagar los daños de los demandantes que determinó ascendieron en total a $77,000.

Apunta la recurrente que incidió el tribunal de instancia al concluir (1) que la muerte de Pastor Rivera se debió a una omisión negligente del personal médico del Hospital de Distrito de Fajardo al no seguir "la norma aceptada en la práctica de la medicina en esta localidad de efectuar diagnósticos diversos y emprender un proceso de eliminación mediante exámenes conocidos y prevalecientes cuando acontece una continuidad en un cuadro patológico perseverante"; (2) al responsabilizar a la recurrente contrario a la prueba y (3) al evaluar excesivamente los daños sufridos por los demandantes.

Es necesario considerar las anteriores conclusiones de hecho a la luz del testimonio de los testigos del caso y la prueba documental consistente del récord clínico de Pastor Rivera llevado por el referido hospital.

En vista de la complejidad técnica envuelta en algunos extremos de la prueba, el tribunal de instancia designó al Dr. José Noya Benítez para que lo asesorase sobre la interpretación del récord clínico y el testimonio de los peritos médicos. Dicho médico compareció en corte y fue ampliamente interrogado por la representación legal de ambas partes.

El récord clínico en cuestión consta acompañado de un informe del Dr. Noya que dice así:

"(1) De acuerdo con la información en el récord médico, el paciente Juan Pastor Rivera tuvo el tratamiento de acuerdo con las normas médicas establecidas en casos similares.

(2) Sin embargo, es mi deber también informar a usted que la información que provee el récord médico es incompleta: en que la causa de la peritonitis difusa aguda, no se encuentra explicada con claridad ni en el récord clínico, ni en el récord operatorio, ni en el récord de autopsia."

Sin embargo en el récord clínico aparece incluido un resumen del caso que indica que Pastor Rivera al ser admitido y previo el examen correspondiente, se le hizo un diagnóstico provisional de cistitis, *cysto lithiasis*, obstrucción del cuello de la vejiga, y pielonefritis. Según el informe de progreso diario del hospital se le hicieron múltiples exámenes de laboratorio. La cistoscopía que se le hizo el cuatro de noviembre reveló la existencia de un cálculo en la vejiga. (Luego se comprobó que era del tamaño de una aceituna.) También se comprobó la existencia de la obstrucción del cuello de la vejiga y una severa cistitis y que debía descartarse la posibilidad de enfermedad en la parte superior del curso. El 5 de noviembre se informó que el cuadro clínico era de peritonitis y enseguida se procedió a realizarle al paciente una laparatomía exploratoria. El informe del examen patológico del tejido revela una peritonitis generalizada secundaria a una apendicitis. El informe operatorio dice que no se pudo encontrar el apéndice en su totalidad pero que se cree que se cortaron fragmentos de la misma. El informe de historia clínica y autopsia informa que Pastor Rivera fue admitido quejándose de dolor desde hacía un año, en el flanco derecho inmediato a la región suprapúbica; que el dolor era contínuo; que tenía gran dificultad en orinar; que tenía el abdomen duro, con marcada sensibilidad en el área indicada; que la operación reveló "una apendicitis perforada"; que se encontró en el vientre una peritonitis aguda con supuración intensa similar a apéndice perforada. En

otra hoja del récord clínico aparece que el paciente sufría de náuseas, apetito pobre, estaba estreñido, y pasaba gases.

Testificó el Dr. Noya que los síntomas típicos de apendicitis aguda empiezan con "un dolor que se corre al cuadrante superior derecho . . . . Empezando en el epigastrio que es el centro superior del abdomen y después al cuadrante derecho del abdomen . . . . El dolor viene acompañado de náuseas, vómitos, fiebre, malestar general . . . hay espasmos de los músculos y hay contracción y el paciente tiende a contraer la pierna derecha . . . . La diarrea no es típica pero puede ocurrir"; que la peritonitis descrita en el protocolo de autopsia estuvo presente varios días en el organismo del paciente; que un cuadro de dolor como el descrito, con náuseas, vómitos, diarreas y encogimiento de pierna, contaje de infección; "Ante un diagnóstico probable de apendicitis, apendicitis aguda, lo que se indica es una operación más pronto posible . . . . El mejor tratamiento es la operación a tiempo." Repreguntado si en este caso se tomaron todas las medidas que la ciencia médica tiene establecida en la comunidad contestó el Dr. Noya que ". . . de acuerdo a la información en el récord, la información en el récord es incompleta . . . si estuviera completo [el récord] . . . yo diría eso pero como no está completo, yo no puedo decir si en un caso en que no ha aparecido la apéndice, se hubieran tomado otras medidas . . . . El tuvo tratamiento de acuerdo con las normas establecidas en casos similares, pero modifico que . . . . Como no aparece . . . . Si el récord estuviera completamente claro yo me afirmaría en eso hasta ahí pero como hay una duda del diagnóstico, de que causó la peritonitis . . . ." Añadió que "Del récord fue así porque el récord no está completo . . . pero si no aparece la apéndice, hay que buscar donde está . . . ." Testificó por último, que del récord no hay evidencia de que algún órgano perforado ocasionase la peritonitis; que para que una infección en un órgano cause peritonitis, "Uno de estos órganos [se había

referido antes al hígado, el estómago, la vesícula y el intestino grueso] para infectar tienen que perforar el órgano hacia afuera."

El Dr. Toro Goyco quien realizó la laparatomía en este caso testificó que:

"Ese día 30 de octubre, según lo vi yo, y se desprende del récord, este señor fue visto en emergencia por el médico de emergencia y fue subido al departamento de cirugía, el señor fue llevado por este médico caminando de sus pies, llevaba unos sobres de los que se usan para echar placas, llevaba unas placas en las manos y fue subido al departamento de cirugía para ser ingresado en cirugía, al departamento de especialistas en urología.

. . . . . . . .

Este paciente fue ingresado al Departamento de Urología, se le siguieron dando los antibióticos urinarios, se le recomendó, se le puso reposo en cama, etc., y se le dieron los antibióticos urinarios que mencioné antes, lo siguió viendo el urólogo y el día 4 de noviembre el urólogo le hizo una operación que se había planeado de antemano al considerar la necesidad o la posibilidad del ingreso del paciente, una de las operaciones que se le iba a hacer al paciente era hacerle una cistoscopía, o sea, una luz para verle el interior."

. . . . . . . .

Según se desprende del récord, el médico que lo examinó dice que se trataba de años su molestia y el médico juzgó a la luz de los signos que eran debido a su enfermedad, infección urinaria."

Informado que el Dr. Noya dijo que el récord del paciente no estaba completo contestó en síntesis, que lo estaba pues revela las intervenciones quirúrgicas que se le hicieron al paciente, los hallazgos, el diagnóstico primero y el post operatorio; que él estuvo en la autopsia y confirmó lo que vio en la laparatomía que realizó en el cuerpo de Pastor Rivera, apareciendo del récord todo lo que ocurrió en forma breve y concisa; que, posiblemente, cuando el Dr. Noya se refiere al

récord como incompleto quiere decir que se ha debido dar una explicación más larga; que del récord no aparece que el paciente tuviera vómitos, náuseas ni diarrea; que según el récord el paciente no presentaba un cuadro de apendicitis al llegar al hospital.

El tribunal de instancia le expresó al Dr. Toro Goyco que su reacción de la prueba era que la apendicitis de Pastor Rivera era susceptible de diagnóstico cuando fue ingresado al hospital; que las autoridades médicas allí se aferraron a un diagnóstico limitado y desatendieron la búsqueda de otros factores del cuadro general latente ya que la muerte se produjo por otras circunstancias; que si "este hombre se diagnostica correctamente el día 30, pues, se habría salvado, se habría extirpado la apéndice . . . la falta, estuvo en no explorar, o sea, no hacer un diagnóstico persistente . . . ." El referido médico le contestó al tribunal que el cuadro que presentaba el paciente "presentaba confusión por el largo historial que el hombre traía"; que el diagnóstico no estuvo equivocado porque "él tenía eso pero . . . eso no era todo . . . . Confundieron al médico, y que eso es una cosa humanamente posible que está pasando todos los días, el paciente, pues, tiene una enfermedad y confunde. . . ."

Los tribunales han establecido determinadas normas aplicables a casos como el que nos ocupa. Son los siguientes:

■ 1.—Existe la presunción, en ausencia de evidencia en contrario, que se ha ejercitado un grado de cuidado razonable y de que se administró el tratamiento adecuado al paciente. Corresponde al demandante presentar evidencia suficiente para controvertir esta presunción y para ello la prueba debe demostrar que existe algo más que una mera posibilidad de que el daño se debiera al incumplimiento por el médico de su obligación. Se requiere que la relación de causalidad no se establezca a base de una mera especulación o conjetura, sino por la preponderancia de la evidencia, o sea,

que el daño se ha debido con mayores probabilidades a la negligencia que el demandante imputa. No puede exigírsele a este respecto que elimine toda otra posible causa de daño. Si la evidencia señala más de una causa probable del daño, no puede imponérsele responsabilidad al médico a menos que del conjunto de la prueba surja que la actuación negligente atribuida a éste es la que con mayores probabilidades lo causó. *Sáez v. Municipio de Ponce*, 84 D.P.R. 535, 543 (1962).

■ 2.—Si el médico ejerce un cuidado y presta una atención al paciente en el diagnóstico conforme a la práctica prevaleciente en la comunidad, es decir, que llena las exigencias profesionales reconocidas, o sea, la práctica aceptable profesionalmente hablando, en determinado lugar y tiempo, y actúa de acuerdo con el mismo, no incurre en responsabilidad aunque el diagnóstico constituya un error de juicio. *Pérez v. E.L.A.*, supra.

■ 3.—Si examina al paciente adecuadamente no es responsable de un diagnóstico equivocado. Sin embargo, en *Hicks v. United States*, 368 F.2d 626 (4th Cir. 1966), dijo el tribunal que cuando los síntomas demuestran la posibilidad de una de dos condiciones, una peligrosa de no atenderse inmediatamente, el médico no se puede limitar a realizar un examen ligero del paciente y entonces darlo de alta. El hecho que de las dos enfermedades posibles la más corriente es la gastroenteritis y la más infrecuente es la otra, o sea, una obstrucción intestinal, no excusa el no haber realizado averiguaciones y pruebas adicionales para distinguir una de la otra; que el médico demandado fue negligente al no seguir la norma establecida para estos casos de hacer averiguaciones en cuanto a diarrea y no hizo un examen rectal que, según la prueba, eran parte del procedimiento indicado en casos como éste para eliminar la posibilidad de gastroentiritis y hacer un diagnóstico definitivo de obstrucción intestinal.

■ 4.—El médico debe tener latitud en el ejercicio de un juicio razonable. No es responsable por un error de juicio a menos que el error sea obvio o sustancial de acuerdo con la referida práctica prevaleciente.

■ 5.—Cuando los síntomas no son discernibles en la forma usual y corriente (*obscure symptoms*) no surge responsabilidad por error en el diagnóstico.

■ 6.—El testimonio de otros médicos de que hubieran dado un diagnóstico distinto o el desacuerdo entre ellos en cuanto al diagnóstico, así como el hecho de que otro médico o cirujano pudiera resolver tratar el caso en forma diferente o mediante el uso de métodos distintos a los usados por el médico demandado, de por sí no justifica concluir que éste fue negligente al equivocarse en su diagnóstico. *Hicks* v. *United States*, supra; *Fisher* v. *Wilkinson*, 382 S.W.2d 627 (Mo. 1964); *Smith* v. *Yohe*, 194 A.2d 167 (Pa. 1963); *Skodie* v. *Hardy*, 288 P.2d 471 (Wash. 1955); *Lawless* v. *Calaway*, 147 P.2d 604 (Cal. 1944); *Hodgson* v. *Bigelow*, 7 A.2d 388 (Pa. 1939); *Pearce* v. *United States*, 236 F.Supp. 431 (D.C. Okla. 1964); *Stottlemire* v. *Cawood*, 213 F.Supp. 897 (D.C. Distr. of Columbia); *McHugh* v. *Audet*, 72 F.Supp. 394 (D.C. Pa. 1947).

Tanto en *Skodie*, supra, como el *Lawless*, supra, se hicieron diagnósticos equivocados de colitis en el primero, y de envenenamiento por ptomaina, causada por haber comido un salchichón enmohecido el día antes, en el segundo. En ambos casos el paciente padecía de apendicitis. En el *Skodie*, supra, el propio paciente informó al médico demandado de la posibilidad de que estuviese sufriendo de apendicitis. En *Lawless*, supra, el médico demandado, desde la primera vez que examinó al paciente indicó la posibilidad de que padeciese de apendicitis, pero lo siguió tratando por varios días hasta que al empeorar fue operado y a las pocas horas murió de peritonitis debido a una apéndice perforada. En ambos

casos se desestimó la reclamación de daños en contra del médico demandado pues no hubo prueba de negligencia al no diagnosticar la apendicitis a tiempo o de que su diagnóstico no fuese consistente con el de otros médicos en la comunidad bajo circunstancias análogas.

■ En el caso ante nos no hubo prueba de que los médicos del recurrente, al examinar y atender al paciente fenecido no actuaron dentro de las normas médicas prevalecientes para casos como éste en la comunidad. Pastor Rivera fue admitido al hospital con un largo y reconocido historial de una afección renal. Según el récord médico no mostraba síntomas típicos de apendicitis sino más bien un cuadro que concordaba perfectamente con su historial médico de afección renal. En efecto, el diagnóstico inicial no estuvo equivocado ya que una cistoscopía realizada el día antes de ser operado demostró que tenía un cálculo del tamaño de una aceituna alojado en el cuello de la vejiga la que producía una obstrucción de la orina, agudo dolor e infección intensa.

El récord médico no demuestra que el paciente fue desatendido. Desde que llegó fue cuidadosamente examinado, se le hicieron todos los exámenes clínicos y de laboratorio de rigor, algunos más de una vez.

El perito designado por el tribunal concluyó que "tuvo un tratamiento de acuerdo con las normas médicas establecidas para casos similares." Sólo criticó el récord médico de estar incompleto "en que la causa de la peritonitis aguda no se encuentra explicada con claridad . . . ." Por el contrario, el cirujano que operó a Pastor Rivera y asistió a la autopsia de su cuerpo demostró que la referida crítica sólo podía referirse a que se ha debido dar una explicación más larga pues en el récord aparece todo lo que ocurrió en forma breve y concisa.

El Dr. Noya testificó, en efecto, que el procedimiento que él sigue en casos como éste es aclarar el diagnóstico

mediante la observación repetida y el examen para diferenciar ante un problema más agudo; que "Este no es un caso fácil . . . que se hicieron las normas habidas, las normas habituales en un caso usual y cuando el caso se volvió difícil entonces faltó la atención precisa." Justificó esta conclusión a base de que "el récord no está completo porque si no aparece el apéndice hay que buscar donde está . . . ." Testificó, por último, que del récord no hay evidencia de que algún órgano perforado ocasionase la peritonitis, que "Uno de estos órganos [se había referido antes al hígado, el estómago, la vesícula y el intestino grueso] para infectar tienen que perforar el órgano hacia fuera."

Como indicó el Dr. Toro Goyco a preguntas del Tribunal, el cuadro que el paciente presentaba se prestaba a confusión debido al largo historial de afección renal del paciente; que aunque el diagnóstico no estuvo equivocado el paciente padecía de otra enfermedad adicional. Testificó, en efecto, que debido al historial que traía el paciente, sus síntomas confundieron a los médicos, cosa humanamente posible que está pasando todos los días.

A nuestro juicio, la prueba demuestra que los síntomas del paciente en este caso no eran discernibles con relativa facilidad, se prestaban a confusión como en efecto confundieron a los médicos no obstante la atención y múltiples exámenes a que sometieron al paciente. El récord demuestra que el paciente no presentaba los síntomas más típicos de apendicitis. El testimonio del Dr. Noya, fue al efecto de que se siguieron las normas prevalecientes en la atención del paciente y en el diagnóstico de su mal excepto que él hubiera tratado de aclarar el diagnóstico mediante la observación repetida y el examen para diferenciar ante un problema más agudo. No hubo prueba de que los médicos dejasen de realizar averiguaciones o exámenes que le hubiesen permitido descubrir la apendicitis a tiempo, como en *Hicks*, supra. En este caso los médicos de la recurrente nunca indicaron inicial-

mente la posibilidad de que el paciente padeciese de apendicitis como en *Lawless*, supra.

Este caso se distingue del de *Pérez* v. *E.L.A.*, supra. En este último se trataba de una niña que se había tragado una habichuela y los médicos, a pesar de que diagnosticaron que se había tragado un cuerpo extraño, la enviaron a su casa porque el examen de rayos X fue negativo. La prueba demostró con toda claridad que faltó, de acuerdo con las normas prevalecientes, el examen de la faringe por dentro hacia donde está la tráquea y la laringe; que los reflejos de la niña indicaban que estaba ahogada; que la placa de rayos X no era suficiente pues en un caso como éste la placa salía negativa. Por el contrario, en el caso ante nos, no había síntomas típicos de apendicitis; los síntomas concordaban con tal precisición con el historial de afección renal de que venía padeciendo el paciente que confundieron a los médicos y no les permitió descubrir a tiempo la apendicitis que, según la historia de la operación y el protocolo de la autopsia, ocasionó la peritonitis aguda de que murió el paciente. El propio Dr. Noya infiere que aun el diagnóstico post operatorio de apendicitis no se comprobó a cabalidad pues la apéndice no apareció y hubo duda en cuanto a qué causó la peritonitis.

En tal virtud *debemos concluir que la sentencia dictada por el tribunal de instancia en este caso en 12 de diciembre de 1969 debe revocarse.*

El Juez Asociado Señor Hernández Matos disintió. El Juez Asociado Señor Torres Rigual no intervino.