ANGEL MORALES, ETC., ET AL., demandantes y recurridos, *v.* HOSPITAL MATILDE BRENES, INC. y DOCTOR FRANCISCO TORRES, demandados y recurrentes.

Número: R-73-57 Resuelto: 18 de abril de 1974

*José R. Fournier,* abogado de los recurrentes; *Ernesto González Piñero* y *Orlando J. Antonsanti,* abogados de los recurridos.

EL JUEZ ASOCIADO SEÑOR TORRES RIGUAL emitió la opinión del Tribunal.

El presente caso ilustra la aplicación de las normas que gobiernan la responsabilidad profesional del médico ampliamente elaboradas en *Oliveros* v. *Abréu,* 101 D.P.R. 209 (1973); *Reyes* v. *Phoenix Assurance Co.,* 100 D.P.R. 871 (1972); *Rivera* v. *E.L.A.,* 99 D.P.R. 890 (1971); y *Pérez* v. *E.L.A.,* 95 D.P.R. 745 (1968). El tribunal de instancia condenó al médico Francisco Torres y al Hospital Matilde Brenes, aquí recurrentes, a pagar solidariamente la cantidad de $39,000 por concepto de los daños sufridos por los recurridos por causa de la negligencia de dicho médico al hacer un diagnóstico equivocado sin tomar en cuenta las diversas posibilidades de diagnóstico que presentaba el cuadro de síntomas de la menor recurrida María Morales Rivera. Como los fundamentos de la revisión solicitada por los recurrentes en esencia constituyen un ataque frontal a la conclusión de negligencia, y siendo ésta una cuestión mixta de hecho y de derecho, es preciso examinar los hechos concluidos por el tribunal de instancia y que sostienen la imposición de responsabilidad.

Al efecto el tribunal de instancia concluyó:

"2. El jueves 16 de julio de 1970, mientras la Srta. María Morales Rivera pasaba sus vacaciones en Puerto Rico en la residencia de su tía la Sra. Rosalina Rivera de Quiles en la ciudad de Bayamón, sintió un intenso dolor en el lado derecho del bajo vientre ante lo cual acudió durante las horas del día al Dispensario Municipal de dicha ciudad donde la atendió el médico de turno. Al visitar dicho Dispensario Municipal presentaba dolor severo en el bajo vientre, tenía fiebre, había vomitado y tenía dificultad en el caminar. Ante este cuadro, el médico de turno diagnosticó 'gastroenteritis', le recetó una inyección que le fue suministrada y la envió a su residencia.

3. Durante horas de la noche del 16 de julio de 1970 la codemandante María Morales Rivera continuó con los síntomas antes descritos, los cuales se prolongaron por todo el viernes 17 de julio y el sábado 18 de julio de 1970. Habiéndose agravado su estado físico y patológico, el sábado 18 fue conducida a la Sala de Emergencia de la Clínica Matilde Brenes aproximadamente a las 9:30 P.M., en donde la atendió el codemandado doctor Francisco Torres. Luego de explicarle la codemandante al doctor Francisco Torres el historial antes mencionado y éste haberla examinado, el referido galeno le diagnosticó nuevamente 'gastroenteritis' y le recetó nuevos medicamentos devolviendo a la joven a su residencia.

Del récord de la Sala de Emergencia traducido al español copiamos, en lo pertinente, lo siguiente: (³)

'Historial Breve . . . si enfermedad describa: paciente femenino de 18 años de edad estaba bien hasta hace tres días en que ella comenzó a sentir dolor abdominal difuso acompañado de náuseas y vómito. Sin diarrea. Sin problemas urinarios. Pulso—108 por minuto, regular. (firma enfermera Maldonado) *Reporte del Médico:* Temperatura 37.6 oral. Abdomen—no hay dolor ante presión ni signo de rebote, no hay viceromegalia. La peristalsis intestinal normal.

"(³) En inglés: 'Brief History . . . if illness describe: 18 y, o. pt: doing well until 3 days ago when she began to feel diffuse abdominal pain accompanied by nausea & vomiting. No diarrhea. No urinary problems. P—108 min. reg—(nurse signature Maldonado) *Physician's Report:*— Temp. 37.6 oral. Abdomen—No tenderness elicited or rebound tenderness. No viscetomegaly—normoactive peristalsis. Disp. (1) Tigan 200 mg IM Stat, (2) Polycillin, (3) Bentyl. (Signed F.A. Torres MD.)' "

Disposición: (1) Tigan: 200 milígramos (mg) intramuscular, (2) Polycillin, (3) Bentyl. (fdo. Dr. Francisco Torres)'

El récord antes copiado está incompleto ya que no se desprende diagnóstico alguno, como tampoco aparecen consignadas las alegadas advertencias que el Dr. Torres supuestamente hiciera en el sentido de que la paciente regresara si continuaba la condición. Ahora bien, del mismo surge lo siguiente:

(1) Que la paciente tenía el cuadro clínico *desde hacía tres días;*

(2) Que *experimentaba dolor abdominal difuso,* acompañado de:

 a) *náuseas*
 b) *vómitos*
 c) *fiebre 37.6 grados*
 d) sin problemas urinarios
 e) *sin diarrea*
 f) pulso 108 por minutos (Taquicardia) y
 g) pulso regular.

En adición no encontró dolor abdominal ante la palpación o rebote, órganos de tamaño anormal ni movimientos intestinales anormales.

El codemandado Torres le recetó Tigan (antiemético contra vómitos), polycillin (antibiótico) y Bentyl (antiespasmódico).

Al concluir dicho diagnóstico, el Dr. Torres—no obstante haberle sido sugerido de la posibilidad de que fuera apendicitis por un tío de la joven María nombrado Julio Rivera de Jesús que la acompañó al hospital y tenía preparación de enfermería auxiliar—descartó tal cuadro, no sospechándolo ni explorándolo por razón del examen practicado en el abdomen mediante el cual no precisó el dolor difuso y el abdomen estaba blando. Tampoco consultó a ningún otro médico, especialista o no, ni creyó necesario el ordenar un urinálisis o un examen de contaje de sangre (CBC). Sin embargo, el Dr. Torres a preguntas del Tribunal, expresó que de haber realizado el contaje de sangre, y haber encontrado altos los glóbulos blancos, considerando el cuadro de dolor abdominal que la paciente presentaba, la hubiese continuado observando clínicamente, aun cuando no la hubiese operado.

4. El domingo 19 de julio de 1970 en horas de la madrugada, la joven María continuó bajo el mismo estado físico y patológico siendo necesaria la comparecencia a la residencia de la demandante de la doctora Edna Rosario quien después de un breve examen médico diagnosticó un estado avanzado de apendicitis y ordenó su ingreso inmediato en la Clínica Hermanos Meléndez de esta ciudad. La misma noche del domingo el Doctor Oscar R. Abriles, luego de un examen y análisis de laboratorio de rutina para estos casos consistentes en CBC y orina, diagnosticó correctamente apendicitis (claro caso de vientre agudo quirúrgico). La sometió a una intervención quirúrgica de emergencia, en la cual se confrontó con un estado agudo, avanzado y peligroso de peritonitis debido a la perforación del apéndice, siendo su diagnóstico al final de la hospitalización: 'Acute perforated appendicitis, diffused generalized peritonitis, sepsis, severe paralitic ileus, anemia, severe metabolic disturbances, evisceration, close loop obstruction, multiple intra-abdominal abscess, abdominal wound abscess.' No alberga duda el Tribunal de que las complicaciones y daños que experimentó la demandante fueron consecuencia de la severidad de la condición primaria: apéndice perforada y peritonitis generalizada. Un diagnóstico correcto a tiempo, solo hubiese requerido una operación quirúrgica de ordinario sin consecuencias graves.

De acuerdo a la prueba desfilada concluimos que la práctica médica prevaleciente en la comunidad, frente a un cuadro de síntomas de 'vientre agudo' (dolor abdominal difuso, vómitos y fiebre) es y debe ser realizar un 'diagnóstico diferencial' que significa buscar y plantearse las varias posibilidades que puedan haber 'Ante todo cuadro clínico se hace un diagnóstico diferencial; esa es la práctica prevaleciente en la comunidad médica.' "

Los recurrentes basan su caso en la defensa de error de juicio arguyendo que el Dr. Torres observó un grado razonable de cuidado realizando un examen completo de la paciente; que no había razón alguna para hacer exámenes de laboratorio ni examen rectal, ya que el cuadro clínico no revelaba un diagnóstico de apendicitis por tener la paciente el vientre blando; que el Dr. Torres no efectuó un diagnóstico diferen-

cial puesto que él consideró y descartó la posibilidad de que se tratara de un caso de apendicitis.

 Los hechos concluidos por el tribunal de instancia y ampliamente sostenidos por la prueba revelan que el cuadro de síntomas presentado por la recurrida María Morales Rivera presentaba más de una posibilidad en el diagnóstico. El Dr. Torres se limitó, sin embargo, a efectuar un examen de rutina a pesar de que él conocía el historial de la paciente, que ésta hacía tres días venía padeciendo de un dolor difuso en el vientre, náuseas, vómito, fiebre, sin diarrea y la pierna derecha encogida; que la paciente había sido atendida por otro médico quien le diagnosticó gastroenteritis y le recetó algunos medicamentos sin que ésta hubiese mejorado.

Ante este cuadro de síntomas que revelaba la posibilidad de un diagnóstico de apendicitis era imprescindible que emprendiera un proceso de eliminación mediante los exámenes y pruebas de laboratorio conocidas y prevalecientes en la profesión. *Pérez* v. *E.L.A.*, supra. No podía descargar su responsabilidad profesional descartando, sin haber agotado el proceso de eliminación, un posible diagnóstico de apendicitis, cuya consecuencia podía resultar peligrosa. Lo menos que pudo haber hecho fue haber mantenido bajo observación continua a la paciente y apercibirla adecuadamente de los riesgos envueltos.

Al respecto nos dice una reconocida autoridad en el campo de la responsabilidad profesional del médico, Ficarra: *Surgical & Allied Malpractice*: [1]

"Un diagnóstico diferencial es muy esencial en la atención de un paciente con una enfermedad abdominal aguda. Muchas condiciones patológicas parecen ser apendicitis aun cuando los síntomas de apendicitis puedan disfrazar otras enfermedades. . . . La eliminación de estas condiciones patológicas una por una ayudará al médico o cirujano lograr un diagnóstico en

---

[1] Publicado por Charles C. Thomas Bannerstone House, Springfield, Ill. (1968).

la mayoría de los pacientes con signos agudos abdominales o síntomas.

I. Apendicitis aguda (a ser diferenciada específicamente de las siguientes).

 A. . . .

 B. . . .

 C. Gastroenteritis aguda.

 D. . . .

 E. . . .

 F. . . .

 G. . . . ." Págs. 257–258 (Traducción nuestra.)

■ Es cierto que el médico no es responsable por el mero hecho de que haga un diagnóstico equivocado. Partiendo de un enfoque justo y realista se admite que en la profesión médica, como en cualquier otra profesión, puede haber errores razonables de juicio. La jurisprudencia reconoce una latitud razonable en el juicio profesional del médico al diagnosticar una enfermedad. *Oliveros* v. *Abréu*, supra, *Reyes* v. *Phoenix Assurance Co.*, supra, *Rivera* v. *E.L.A.*, supra y *Pérez* v. *E.L.A.*, supra.

El criterio de razonabilidad supone, sin embargo, que el médico efectúe todos los exámenes necesarios para llegar a un diagnóstico correcto. Tiene el deber de hacer un esfuerzo honesto y concienzudo para enterarse de los síntomas y de la condición del paciente.

■ En el caso de autos, como hemos visto, el recurrente Dr. Francisco Torres no agotó los medios a su alcance, como las pruebas de laboratorio, el examen rectal, consulta a otro médico especialista y mantener bajo observación continua a la paciente apercibiéndola adecuadamente de los riesgos, antes de descartar un diagnóstico de apendicitis. Su omisión es la que justifica y sirve de base a la imposición de responsabilidad profesional y no el haber hecho un diagnóstico equivocado.

*Se dictará sentencia confirmando la sentencia dictada por el tribunal de instancia.*