EVA MARTÍ MÉNDEZ ET ALS., demandantes y recurridos, *v.* DR. FRANCISCO ABRÉU FESHOLD ET ALS., demandados y recurrentes, y el ESTADO LIBRE ASOCIADO DE PUERTO RICO, codemandado, tercero demandado y recurrido.

*Número:* RE-94-143          *Resuelto:* 9 de junio de 1997

*Teresa M. García Moll*, del *Bufete Irizarry, Otero & López*, abogada de la parte recurrente; *Godwin Aldarondo-Girald*, del *Bufete Aldarondo–Girald*, abogado de la parte recurrida; *Carlos Lugo Fiol, Procurador General*, y *Delmarie Vega Lugo, Procuradora General Auxiliar*, abogados del Estado Libre Asociado de Puerto Rico, parte recurrida.

524

— O —

Opinión disidente del Juez Asociado Señor Negrón García.

Al trazar el paralelismo existente entre las dos (2) grandes profesiones liberales —Medicina y Derecho— apunta Jaime M. Mans Puigarnau, en su reputada obra *Lógica para Juristas*, Barcelona, Ed. Bosch, 1969, pág. 18, que "[e]l mismo punto de arranque de las respectivas actuaciones profesionales tiene un fundamento común en la lógica inductiva: *el diagnóstico médico, que va del hecho sintomático al hecho patológico y el dictamen del jurisconsulto, que procede del hecho indiciario al hecho jurídico*". (Énfasis suplido.)

# I

Hace varios años este Tribunal consagró la norma de que "[e]l diagnóstico como *preámbulo* al tratamiento médico constituye el elemento cardinal de la medicina. *Toda aproximación judicial debe inquirir en cuanto a su calidad, extensión y eficacia como punto de partida para el problema planteado de la negligencia médico-hospitalaria"*. (Énfasis suplido y en el original.) *Pérez Cruz v. Hosp. La Concepción*, 115 D.P.R. 721, 735 (1984).

Al hacerlo, pautamos del modo siguiente la dinámica multidimensional del diagnóstico:

> Se acepta que no existe un examen físico completo perfecto. Por ello la metodología de la medicina moderna parte de varias premisas. Primero, un examen básico rutinario permitirá, de ordinario, identificar casi cualquier anormalidad significante. Identificada ésta, se procederá a inspeccionar en detalle el área que representa problemas. El propósito es detectar con el mayor grado de certeza posible el misterio de determinada dolencia, esto es, obtener un diagnóstico. Un buen método es aquel basado en una rutina lógica y ordenada. Al desarrollarse sistemáticamente este plan se logra economizar tiempo y minimizar el riesgo de error por omisión. La experiencia demuestra que son más los errores de este tipo que los de acción. 9 Cantor, *Traumatic Medicine and Surgery for the Attorney*, Washington, D.C., Butterworth, 1963, pág. 604. *Claro está, no puede diagnosticarse una condición apropiadamente si no se tiene razón alguna para sospechar su existencia.* A.R. Holder, *Medical Malpractice Law*, 2da ed., New York, J. Wiley & Sons, 1978, pág. 71.
>
> Segundo, un diagnóstico correcto depende de dos (2) factores importantes: recopilación y análisis de la información. *El primero, acopio de datos, requiere del médico capacidad para obtener datos certeros mediante la entrevista médica, historial del paciente y el examen físico.* El análisis conduce al objetivo perseguido mediante una evaluación lógica de la data ante sí. Este proceso demanda conocimientos abarcadores y nociones en esta rama del saber. *Reconocer sus propias limitaciones y saber cuándo referir un paciente a otro médico o acceder a cualquier consulta que éste o sus familiares interesen, es procedente y representa un curso de acción normal y contemplado del proceso.* Sherman y Fields, *Guide to Patient Evaluation*, 3ra ed., New

538

York, Medical Examination Pub. Co., 1978, pág. 335. El médico examinador puede desorientarse o simplemente no detectar anormalidades debido a falta de destreza, tiempo o por ausencia de claves *atribuibles a un historial incompleto.* Sharpe, Fiscina y Head, *Law and Medicine,* St. Paul, Minnesota, West Pub. Co., 1978, pág. 26. *Por ende, el acopio negligente de información esencial es fuente que genera responsabilidad profesional en daños.* Adametz, *Failure to Make Diagnostics Test,* 210 J.A.M.A. 213 (1969). La importancia del historial médico estriba en que sugiere áreas a ser escrutadas en el examen físico y establece las bases para iniciar posibles diagnósticos. Se puede obtener mediante un informe narrativo del paciente, familiar cercano o persona que lo conozca, comenzando desde el momento en que por última vez se sintió bien. Precisamente ese momento es el que debe servir como punto de partida para un interrogatorio meticuloso concerniente a la presencia o ausencia de síntomas o signos reveladores. Se requiere que se formulen todas las preguntas cuyas contestaciones muevan o permitan obtener toda la información necesaria y relevante. Es tarea investigativa cuyo éxito depende de múltiples factores, tales como edad del paciente, preparación, grado de precisión, capacidad para recordar y otros. No debe descansarse tan sólo en lo que suministra voluntariamente el paciente. Holder, *op. cit.,* pág. 72. *Además de ese historial, se impone el uso auxiliar de pruebas rutinarias, sencillas y económicas de laboratorio para diagnosticar la condición de un paciente. Su omisión también puede ser motivo para incurrir en responsabilidad por negligencia.* Holder, *íbid,* pág. 85. (Énfasis suplido.) *Pérez Cruz v. Hosp. La Concepción,* supra, págs. 735–736.

Ahora bien,

[e]s cierto que el médico no es responsable por el mero hecho de que haga un diagnóstico equivocado. Partiendo de un enfoque justo y realista se admite que en la profesión médica, como en cualquier otra profesión, puede haber errores razonables de juicio. La jurisprudencia reconoce una latitud razonable en el juicio profesional del médico al diagnosticar una enfermedad. ...

El criterio de razonabilidad supone, sin embargo, que *el médico efectúe todos los exámenes necesarios para llegar a un diagnóstico correcto. Tiene el deber de hacer un esfuerzo honesto y concienzudo para enterarse de los síntomas y de la condición del paciente.* (Énfasis suplido y citas omitidas.) *Morales v. Hosp. Matilde Brenes,* 102 D.P.R. 188, 194 (1974).

Nuestra doctrina de responsabilidad civil extracontrac-

tual postula que quien por acción u omisión cause daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado.[1]

Como profesionales, a los médicos se les exige brindar aquel tratamiento que, a la luz de los modernos medios de comunicación y enseñanza, llene las exigencias profesionales generalmente reconocidas por la profesión médica. *Rodríguez Crespo v. Hernández*, 121 D.P.R. 639 (1988); *Medina Santiago v. Vélez*, 120 D.P.R. 380 (1988); *Pérez Torres v. Bladuell Ramos*, 120 D.P.R. 295 (1988); *Ríos Ruiz v. Mark*, 119 D.P.R. 816 (1987); *Cruz v. Centro Médico de P.R.*, 113 D.P.R. 719 (1983); *Oliveros v. Abréu*, 101 D.P.R. 209 (1973); *Reyes v. Phoenix Assurance Co.*, 100 D.P.R. 871 (1972); *Rivera v. E.L.A.*, 99 D.P.R. 890 (1971).

## II

En esa tarea, es de vital importancia que todo médico realice y conserve sus expedientes (*record*) claros y completos sobre los síntomas, diagnósticos, tratamientos y medicamentos prescritos a cada paciente. Este expediente debe ser lo equivalente al historial desde que el médico lo admite como su paciente, hasta el momento en que o lo da de alta o por otra razón cesa la relación médico-paciente. Documentar los detalles en cuanto a todo lo relacionado con el cuidado de la salud se justifica por varias razones de política pública. Veamos.

Un paciente puede ser atendido en varias ocasiones por el mismo médico para tratarlo por una o varias enfermedades, relacionadas o no entre sí. Las anotaciones sobre información básica (cirugías antes realizadas, medicamentos a los cuales sea alérgico, historial de enfermedades de familiares inmediatos, tratamientos habidos, etc.) *suminis-*

---

[1] Requiere probar: (a) la producción del daño; (b) el acto o la omisión culposa o negligente, y (c) la existencia de un nexo causal entre el daño y la acción u omisión. Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141.

*tran al médico una visión más integral del paciente. Mientras más completo sea el expediente, mayor su entendimiento de ese cuerpo humano en particular.*

También el paciente puede ser atendido en una oficina o un hospital *por más de un médico*, ya sea porque al tratar varias condiciones independientes requiera la intervención de especialistas o porque, aun cuando se esté tratando una sola condición, la división de trabajo, tareas u horarios, al igual que cuando surgen complicaciones, exige que el médico consulte o participe otro compañero.

En estos casos, cuando intervienen de una manera u otra más de un médico con un paciente, un expediente claro y completo ayuda a que cada uno tenga un cuadro completo de su condición, y pueda prescribir el tratamiento más adecuado.

Imponer a los médicos el deber de mantener los expedientes de forma rigurosa responde también a que al diagnosticar una condición a base de varios síntomas del paciente, el galeno tenga el beneficio de saber cualquier condición previa ya identificada por otro médico, así como qué medicamentos le han sido prescritos. Además, persigue el que al momento de prescribir un medicamento, pueda determinar cuál está indicado o contraindicado de acuerdo con la intervención previa de otro médico.

Fuera de la oficina o el hospital, esta norma simplifica la tarea judicial al tener que adjudicar responsabilidad profesional. Unos expedientes médicos adecuados ayudan a que, a la hora de examinar las actuaciones médicas, conozcamos mejor la situación de todo el tratamiento. Los hechos documentados en estos expedientes médicos son la mejor evidencia para demostrar, *entre otras cosas, que cierto examen médico se realizó* o el medicamento que se recetó.

Aclaramos, sin embargo, que la falta de dichas anotaciones en el expediente no necesariamente constituye negligencia per se. Ahora, dicha omisión puede ser un factor al

considerarse la credibilidad que el médico merezca ante el tribunal. Somos los tribunales los llamados a determinar si un médico, bajo ciertas circunstancias, a incurrido en negligencia. En la medida en que el juzgador tiene discreción para creer el testimonio de un médico o dirimir adversamente su credibilidad frente a testimonios distintos de testigos —sobre el tratamiento o diagnóstico realizados cuando no están documentados en el expediente del paciente— *la clase médica puede protegerse contra pleitos injustificados con un expediente médico completo y adecuado.*

Con el fin de que los expedientes médicos sean los más completos y claros posibles, deben incluirse todos los resultados de exámenes y pruebas a que sea sometido el paciente. No debe ser factor determinante si el resultado fue *positivo o negativo. La mejor práctica aconseja documentar todo resultado.* Nos explicamos.

*Es norma aceptada que los exámenes cuyo resultado son positivos tienen que documentarse.* De otra manera perderían todo propósito. Ahora bien, hay quienes piensan que los resultados negativos no tienen que ser documentados, sino sólo aquello que es adverso al estado de salud del paciente. Sin embargo, documentar los resultados negativos ayuda a que pueda evaluarse al paciente de una manera más adecuada: *un expediente médico que incluye ambos resultados pone al médico en posición de controlar tanto los cambios en mejoría como en deterioro en la salud.* Finalmente, las advertencias u observaciones que se le hacen al paciente y a los familiares deben documentarse, pues ayudan al juzgador a la hora de determinar si hubo o no consentimiento informado.

## III

Con este trasfondo doctrinario en mente, la prueba testifical y documental revela que el Dr. Francisco Abréu Feshold no observó las buenas normas profesionales expuestas

al atender y diagnosticar a Juan Tirado Montes.(²) *Se limitó a un examen superficial y ligero.* Según su propio testimonio, *"nunca consideró la posibilidad de que estuviese pasando por un infarto al miocardio".* T.E., pág. 107. Todo ello, "partiendo del diagnóstico de una esofagitis como consecuencia de una posible hernia en el hiato". T.E., pág. 105. Peor aún, conociendo que estadísticamente una persona mayor de cincuenta (50) años que estaba *sufriendo un infarto,* como signo *refleja dolor en el epigastrio,* estimó "altamente improbable" esa posibilidad, al extremo de que no mandó a hacer ningún análisis o pruebas que hubiesen demostrado lo contrario. T.E., págs. 108 y 113. *No estamos, pues, ante un error de juicio razonable, sino de un juicio erróneo atribuible a la negligencia de dicho galeno.* Expongamos sucintamente los hechos.

En la mañana del 6 de mayo de 1989, Tirado Montes, de setenta y tres (73) años, sintió *dolor abdominal, y estaba sudoroso, pálido e intranquilo.* T.E., pág. 11. Su esposa, la señora Martí Méndez, solicitó telefónicamente una cita de emergencia con el doctor Abréu Feshold, al indicarle a la secretaria que su esposo se sentía muy enfermo. Ella le

---

(²) La Sra. Eva Martí Méndez, hija Sara Tirado y nietos Flavio Christopher, Darek J. y Sarah T. Toro Tirado, lo demandaron, y alegaron que incurrió en negligencia y mala práctica de la Medicina al realizar un examen superficial a Tirado Montes. *Como resultado diagnosticó esofagitis y hernia al hiato, cuando en realidad sufría un infarto al miocardio que eventualmente le causó la muerte.*

En su contestación, el doctor Abréu Feshold negó haber incurrido en mala práctica y formuló una demanda contra tercero contra el Estado Libre Asociado. Adujo que el tratamiento médico brindado a Tirado Montes en el Hospital de Área de Carolina no fue conforme la mejor práctica de la Medicina y los estándares reconocidos. El 8 de mayo de 1992, la señora Martí Méndez y demás demandantes enmendaron su demanda para incluir al Estado como codemandado. Oportunamente, éste negó toda responsabilidad.

Luego de varios trámites procesales y una vista en su fondo, el ilustrado Tribunal de Instancia (Hon. Bárbara Sanfiorenzo Zaragoza, Juez), dictó una sentencia en la que declaró con lugar la demanda contra el doctor Abréu Feshold. Desestimó las demandas contra el Estado Libre Asociado. Condenó al doctor Abréu Feshold y a su asegurador a satisfacer doscientos cincuenta y cuatro mil dólares ($254,000) por daños, sufrimientos y angustias mentales y honorarios.

A solicitud del doctor Abréu Feshold, acordamos revisar. Los errores giran en torno a la apreciación de la prueba, cuantía concedida e imposición de honorarios de abogados.

informó que no podía darle cita, pero que lo llevara al consultorio. T.E., págs. 11–12.

A las 10:00 A.M. ambos arribaron a dicho consultorio médico. *Sin éxito*, solicitaron pronta atención. Eventualmente, con carácter de *último turno*, fue examinado por el doctor Abréu Feshold. Éste detectó dolor abdominal y náuseas. Tirado Montes no tenía dolor de cabeza, disnea (dificultad al respirar) ni pérdida de conocimiento. Su pulso era de 76 por minuto y *su presión arterial de 140/ 105*. Sus pulmones estaban claros, abdomen blando, con ligero dolor a la palpación en el epigastrio. T.E., págs. 95–96.

El doctor Abréu Feshold no le preguntó sobre su historial de salud: si era fumador, diabético o sufría de alta presión arterial. T.E., pág. 110. Tampoco inquirió si tenía familiares con condiciones cardíacas u otras enfermedades. Circunscribió su historial clínico a que el paciente había ingerido varios tragos la noche anterior. *No ordenó análisis de laboratorios rutinarios de sangre, orina o enzimas cardíacas.* T.E., pág. 109. *Aunque no tenía máquina de electrocardiograma (EKG) —pues no sabía leer sus resultados— tampoco le ordenó ninguno ni* lo refirió a otro médico u institución hospitalaria. T.E., pág. 108.

El doctor Abréu diagnosticó esofagitis o una hernia de hiato sintomática. Únicamente ordenó una placa de la vía gastrointestinal y le recetó Gaviscon, Pepcid y Lozol. T.E., pág. 106. Este último medicamento (*Lozol*) es un diurético y lo recetó "para tratar de controlar e[l] estado de hipertensión en ese momento en [su] oficina". T.E., pág. 106.

Poco después de trasladarse a su hogar, cerca de las 2:00 P.M., la señora Martí Méndez se percató de que su esposo yacía en la cama pálido, sudoroso, frío y con mucha dificultad al hablar. El dolor abdominal empeoró. Con la ayuda de unos vecinos, lo trasladó a la Sala de Emergencia del Hospital de Área de Carolina. Allí, a las 3:25 P.M. le tomaron sus signos vitales, que arrojaron treinta y seis

(36) grados de temperatura, pulso o respiración, de veinte (20) ciclos y presión arterial cero (0). Se emitió un diagnóstico de infarto al miocardio y ordenaron exámenes de laboratorio. Se le suministró 1,000cc. de normal salina y glucano de calcio, y se le conectó a un monitor cardíaco. Se levantaron sus piernas, se ordenó un marcapasos y que se tomara la presión cada quince (15) minutos. T.E., págs. 132–134.

A las 4:25 P.M., mientras se encontraba en la unidad de cuidado intensivo, Tirado Montes se fue en paro cardio-respiratorio. Se le ofreció el tratamiento correspondiente, incluso resucitación cardiopulmonar, teniendo que ser entubado por la vía endotraqueal. Le suministraron varias dosis de epinefrina, astropina y bicarbonato. A pesar de todos los esfuerzos médicos, no fue posible restablecer la función cardíaca y respiratoria. Falleció a las 4:45 como consecuencia de un *infarto agudo al miocardio*. T.E., págs. 135–137.

## IV

El *infarto al miocardio* se define como "[n]ecrosis de una porción del músculo cardíaco privada de aporte sanguíneo, casi siempre a consecuencia de la trombosis de una arteria coronaria". M. Garnier, *Diccionario de los términos técnicos de medicina*, 20 ma ed. rev., Madrid, Ed. Norma, 1981, pág. 544. Se caracteriza por *incomodidad retroesternal* o precordial que es descrita como dolor quemazón (*burning sensation*), apretamiento del área e hinchazón. Dicha incomodidad se refleja en la parte superficial del pecho y frecuentemente hacia los brazos y/o el cuello o la mandíbula. En circunstancias no comunes, el dolor puede sentirse en la parte trasera, o sea, en la espalda (en medio de la escépula). *Otros síntomas que acompañan esta condición incluyen disnea, diaphoresis, náusea y vómitos.*

*Aproximadamente un veintitrés por ciento (23%) de los infartos al miocardio no se detectan debido a la ausencia de síntomas o ausencia de dolor en el pecho. Síntomas comunes en este grupo son: dolores poco comunes, disnea, náusea, vómito y/o dolor epigástrico.* Un infarto al miocardio puede apreciarse mediante un fallo cardíaco, arritmia, sentido de aprehensión, mucha debilidad, indigestión aguda, pericarditis, un derrame (*stroke*), un coágulo situado en la periferia (*peripheral embolus*). *Los pacientes ancianos mayormente son los que presentan estos llamados síntomas atípicos o poco comunes.*

Los pacientes con esta condición usualmente lucen algo grises con cierto pánico o cansancio. *El sudor es muy común en ellos.* En casos severos, *el paciente estará ansioso, con la cara pálida y muy sudoroso.* R.C. Shclant y R.W. Alexander, *The Heart*, 8va ed., Nueva York, Ed. McGraw-Hill, 1994, pág. 1114.

De otra parte, *las enfermedades del esófago* se caracterizan por la presencia de tres (3) síntomas: *Dysphagia, Odynophagia* y *dolor en el pecho.* La *Dysphagia* es la dificultad al tragar; la *Odynophagia,* el dolor severo y agudo al tragar. American College of Physicians, *Gastroenterology and Hepatology*, Philadelphia, American College of Physician, 1995, págs. 873–874.

En el caso de la *esofagitis,* los síntomas de esta condición son mayormente *dolor epigástrico* o *retroesternal,* y quemazón (*burning in quality*), que se precipita al doblarse la persona. La sensación de ardor (*heartburn* o pyrosis) procedente del estómago, acompañada de eructos agrios, es característico en esta condición. Shclant y Alexander, *op. cit.*, pág. 464.

*El estudio sintomatológico refleja que ambas condiciones poseen características muy parecidas,* a saber, dolor epigástrico o retroesternal, quemazón (*burning sensation*) y dolor en el pecho. *Frente a esta realidad, es un imperativo de la*

*buena práctica médica, cuanto menos, iniciar y practicar un diagnóstico diferencial para poder descartar la posibilidad de un infarto al miocardio.*

## V

La negligencia del doctor Abréu Feshold es evidente. Testificó que llegó a su diagnóstico a base del malestar en el epigastrio, náuseas, dolor a la palpación, examen físico y al hecho de que el paciente Tirado Montes había ingerido varios tragos la noche anterior. *Nunca consideró que se tratara de un infarto del miocardio en progreso ni creyó necesario hacer un electrocardiograma ni pruebas dirigidas a descartar dicha condición.* Aceptó que una persona mayor de cincuenta (50) años puede reflejar dolor en el epigastrio cuando sufre un infarto del miocardio; aún así, no lo consideró por ser "altamente improbable". T.E., pág. 108.

La prueba pericial creída por el tribunal de instancia estableció que los síntomas más característicos del infarto al miocardio son: dolores de pecho irradiados hacia el brazo izquierdo, palidez, sudor frío, dolores gastrointestinales que incluyen náuseas y vómitos, presión alta o baja y palpitaciones con ritmo de galope. *Los síntomas varían de un caso a otro y el dolor se refleja dependiendo de donde se localice el infarto.* Se estableció que una presión 140/105 era *alta* y reflejaba *problemas en la presión sanguínea del corazón.* Además, que en *un paciente de mayor edad, fumador, con dolor en el epigastrio, náuseas, presión alta y sudoroso no debió descartarse un diagnóstico de un infarto al miocardio.* Los peritos coincidieron en que el historial de paciente es indispensable para llegar a un diagnóstico adecuado. Un médico, además de escuchar las quejas del paciente, debe estudiar su historial de salud y familiar.

Tirado Montes presentó síntomas de los cuales podía lógicamente colegirse que, *en término de probabilidades*, podía estar sufriendo una grave condición cardíaca. Su

presión era alta y tenía dolor en el epigastrio; además, era un hombre de edad avanzada. Todo este marco exigía al profesional realizar un *diagnóstico diferencial*, dada la gran posibilidad de que existiese alguna condición cardíaca. No obstante lo anterior, el doctor Abréu Feshold no ordenó un análisis ni un electrocardiograma, el cual es muy sensitivo para detectar un infarto al miocardio. Shclant y Alexander, *op. cit.*, pág. 116. No hizo preguntas sobre el historial de salud del paciente, si era fumador, diabético, si sufría de alta presión arterial, ni inquirió sobre el historial de enfermedad en su familia.

## VI

Bajo las normas antes expuestas, la forma del doctor Abréu Feshold de llevar los expedientes médicos de sus pacientes, deja mucho que desear. Según su testimonio, como norma general sólo escribe "lo que llamamos lo positivo, lo que puede manifestar, lo que me dice el paciente". T.E., págs. 97–98. O sea, si no lo encontró suduroso, no lo escribe; igual si no le falta el aire. Íd. Ese enfoque limita en gran medida la utilidad inmediata y futura del expediente. Como sistema, puede ser incompleto y poco confiable. Parte de la premisa de que el médico realizó un examen completo; no revela las preguntas y respuestas sobre el historial familiar y otros hallazgos.

El historial del paciente es de vital importancia para realizar un diagnóstico temprano del infarto agudo del miocardio. Russell, *Síndromes Isquémicos Agudos*, Adult Clinical Cardiology Self Assesment Program, págs. 2.3–2.5.

La razón es sencilla. En casos como éste, el "[s]ervicio de urgencias debe estar capacitado para evaluar rápidamente a los pacientes con posible infarto de miocardio. *Deben llevarse a cabo todos los esfuerzos necesarios para conseguir identificar a estos pacientes en cuanto entran en el*

*departamento. Aquellos pacientes que presenten dolor u opresión torácica, molestias epigástricas o cualquier otro síntoma que sugiera un posible infarto de miocardio, deben contar con monitorización electrocardiográfica desde el momento de su ingreso. Deben identificarse los signos vitales y obtener rápidamente un electrocardiograma de doce (12) derivaciones. Un médico debe evaluar al paciente durante los primeros minutos después de su llegada.* Íd., pág. 2.5.

En resumen, ante el cuadro que presentaba la condición de Tirado Montes, unido a su edad y otros factores, la buena práctica de la Medicina exigía hacerle un análisis de laboratorio y un electrocardiograma; entonces referirlo a un hospital para efectuarle dichas pruebas y otros exámenes que definitivamente pudieran descartar o confirmar un diagnóstico de infarto al miocardio.

Confirmaríamos.