Opinión concurrente y disidente emitida por la
Juez Aso-ciada Señora Rodríguez Rodríguez.
Concurro con la opinión que emite hoy este Tribunal por entender que es acertada la devolución del caso al Tribunal de Primera Instancia para que detalle los porcentajes de responsabilidad de los codemandados, incluyendo aquéllos que hayan transigido el pleito con los demandantes. No obstante, disiento porque al confirmar al foro sentenciador en la estimación de los daños, se abandona el procedi-miento establecido por esta Curia apenas hace dos años en Herrera, Rivera v. S.L.G. Ramírez-Vicéns, 179 D.P.R. 774 (2010). Con esta última actuación, el Tribunal descarta el precedente establecido en aquel caso sin justificación plausible para ello, violentando así los principios básicos sobre el precedente judicial que hemos proferido anteriormente.
*925 I
Los hechos que circunscriben la presente controversia están debidamente detallados en la Opinión mayoritaria, por lo que entendemos innecesario caer en la redundancia de la repetición. “Es doctrina claramente establecida por este [Foro] que un tribunal apelativo no intervendrá con las determinaciones de hechos ni con la adjudicación de credibilidad que hizo el juzgador de los hechos, salvo que haya mediado pasión, prejuicio, parcialidad o error manifiesto”. Rolón v. Charlie Car Rental, Inc., 148 D.P.R. 420, 433 (1999). En el caso de daños y perjuicios por impe-ricia médica ante nosotros, tras analizar detenidamente el expediente no vemos razón para inclinarnos por la excep-ción a la norma general anterior; los hechos recogidos en la Sentencia del Tribunal de Primera Instancia y adoptados por la Opinión mayoritaria merecen nuestra deferencia.
En síntesis, lo que merece nuestra atención en términos jurídicos es, primero, si el foro de instancia debe constatar en su sentencia los porcientos de responsabilidad de cada codemandado, aun si alguno ya transigió el pleito con la parte demandante, y segundo, cómo debe computarse un daño cuando se usa como base el valor otorgado en un caso previo. Sobre este segundo asunto, la Opinión del Tribunal propone que abandonemos nuestro previo pronuncia-miento en Herrera, Rivera v. S.L.G. Ramírez-Vicéns, supra, sobre la utilización de una fórmula compuesta por el índice de inflación de la moneda más el crecimiento económico, y que adoptemos ahora sólo la utilización del índice del valor adquisitivo del dólar.
II
En cuanto al primer asunto a considerar, estimamos co-rrecta la decisión de devolver el caso para que el Tribunal *926 de Primera Instancia determine la participación porcen-tual de los codemandados liberados, si alguna. Como vere-mos, dicha norma ya se deducía de la jurisprudencia dic-tada por este Foro.
Sobre los contratos de transacción en un pleito por da-ños y perjuicios, hemos sido enfáticos en que “[e] 1 relevo o descargo de responsabilidad hecho por un demandante a favor de un codemandado y codeudor solidario, no releva de responsabilidad a los demás causantes comunes del daño, cuando la intención de las partes en el acuerdo de desistimiento así lo reconoce”. S.L.G. Szendrey v. Hospicare, Inc., 158 D.P.R. 648, 655 (2003). Véase, además, Merle v. West Bend Co., 97 D.P.R. 403 (1969).
Para auscultar qué efectos tendrá el acuerdo transaccio-nal, será necesario establecer primero qué fue lo que se pactó. US Fire Insurance v. A.E.E., 174 D.P.R. 846, 855 (2008). Tras examinar el alcance de la transacción, “el tribunal tendrá que determinar en su sentencia el monto lí-quido total de los daños ocasionados a la parte deman-dante por todos sus cocausantes y deducirá de dicho monto total aquella porción monetaria equivalente al grado de responsabilidad de[l guardar espacio codemandado relevado]”. S.L.G. Szendrey v. Hospicare, Inc., supra, pág. 658.
En el caso de autos la parte demandante llegó a un acuerdo transaccional confidencial con dos de los codemandados. Tras ello, los demandantes sometieron al tribunal dos mociones de desistimiento voluntario parcial contra esos dos codemandados, en razón de llegar al men-cionado acuerdo. En dichas mociones se expresó que el al-cance de las transacciones era liberar de responsabilidad al codemandado Hospital Dr. Susoni y al codemandado Ad-ministración de Servicios Médicos de Puerto Rico (A.S.E.M.) de las relación externa e interna entre los de-más codemandados. En ninguna de la mociones de desisti-miento se hizo expresión a los efectos de aceptación de res-ponsabilidad por parte de los dos codemandados relevados.
*927 Ante ese cuadro, y siguiendo nuestras expresiones en S.L.G. Szendrey v. Hospicare, Inc., supra, procedía que el Tribunal de Primera Instancia emitiera una sentencia en donde adjudicara el porciento de responsabilidad de cada codemandado, incluyendo a los liberados por motivo de la transacción. De estimar que éstos no fueron responsables en la causa del daño, así debió hacerse constar. Por el con-trario, de concluir que sí contribuyeron en la producción del daño, debió reducirse sus porcientos de responsabilidad del monto total al que son acreedores los demandantes.
III
Examinemos ahora lo atinente a la valoración de los daños. Como parte de la discusión, es necesario pronun-ciarnos en torno a las implicaciones que tiene la Opinión mayoritaria sobre nuestras decisiones pasadas, a la luz de la doctrina del precedente judicial.
A
La estabilidad, la certeza, la eficacia y la reducción de arbitrariedad en la toma de decisiones judiciales son valo-res axiomáticos del Derecho y de un sistema de justicia objetivo y confiable. Véase Vázquez Vélez v. Caro Moreno, 175 D.P.R. 986, 987 (2009) (Rodríguez Rodríguez, J., voto particular disidente). Por ello es que teóricos sobre el tema siempre han reconocido que “[c]ertainty and predictability are, in addition to flexibility, the basic goals of all legal systems”. A.P. Sereni, The Code (Napoleon) and Case Law en D. Lloyd, Introduction to Jurisprudence, ed. rev., Nueva York, Frederick A. Praeger, Inc., 1965, pág. 397.
La valorización del precedente judicial responde a con-sideraciones sobre la estabilidad y la certidumbre que debe tener el Derecho, en ánimo de impartir una justicia equitativa. Véase, e.g., K.N. Llewellyn, Case Law en En- *928 cyclopdia of the Social Sciences, Nueva York, The Macmillan Company, 1930, Vol. III-IV, pág. 249 (“The force of precedent in the law is heightened by ... that curious, almost universal sense of justice which urges that all men are properly to be treated alike in like circumstances”). El ra-zonamiento detrás del precedente judicial estriba en que resulta ventajoso utilizar experiencias acumuladas de ca-sos previos, además que evita tener que atender un mismo problema de forma diferente cada vez que se presenta ante un tribunal. Véase M.D.A. Freeman, Lloyd’s Introduction to Jurisprudence, 8va ed., Londres, Sweet Maxwell, 2008, pág. 1536.
Ahora bien, la aplicación de la doctrina del precedente judicial no debe ser automática, sino ponderada. Por tal motivo se ha reconocido que uno de los principales peligros de ésta es que podría conducir a procesos estereotipados, insensatos y absurdos. Freeman, op. cit. Por ello se habla de que la certeza judicial de las decisiones, que es uno de los valores detrás de la doctrina en cuestión, no puede ser absoluta. K.N. Llewellyn, The Common Law Tradition: Deciding Appeals, Boston, Little, Brown and Company, 1960, pág. 17 (“I see no absolute certainty of outcome in any aspect of legal life, and think that no man should ever have imagined that any such thing could be, or could be worth serious consideration”).
Conscientes de mantener una norma que valore la cer-teza judicial, pero sin que llegue a fosilizar el desarrollo del Derecho, esta Curia se ha expresado a los efectos de que una decisión “no debe ser variada a menos que sea tan manifiestamente errónea que no pueda sostenerse sin vio-lentar la razón y la justicia”. (Enfasis suplido). Capestany v. Capestany, 66 D.P.R. 764, 767 (1946). Conforme a ese estándar que hemos pautado en nuestra jurisprudencia, cuando se va a revisar un precedente es necesario la con-vergencia de varias circunstancias:
Primero, que la norma adoptada se revele inconsistente y an- *929 tagónica con otras normas establecidas posteriormente. Segundo, que la norma establecida resulte inoperante por la ca-rencia de estándares objetivos y manejables para su aplicación. Tercero, que las condiciones que hicieron posible el primer dictamen cesen o pierdan eficacia. Y, por último, pro-cede la revisión de un precedente cuando el razonamiento ju-rídico sobre el cual se asentó la norma establecida ya no res-ponde a los valores de una sociedad moderna, diversa y plural. Vázquez Vélez v. Caro Moreno, supra, págs. 988-989 (Rodrí-guez Rodríguez, J., voto particular disidente).(1)
Con este marco normativo, evaluemos la controversia de autos para demostrar que con el proceder de una mayoría de este Tribunal se atenta injustificadamente contra la cer-teza y la certidumbre de nuestras decisiones previas.
B
“En innumerables ocasiones hemos establecido que la tarea judicial de estimar y valorar los daños resulta difícil y angustiosa, debido a que no existe un sistema de compu-tación que permita llegar a un resultado exacto en relación con el cual todas las partes queden satisfechas y complacidas”. Herrera, Rivera v. S.L.G. Ramírez-Vicéns, supra, pág. 784. Por ello, como norma general, los tribuna-les apelativos descansan en la discreción y razonabilidad de los jueces de instancia, quienes tienen un vínculo más cercano con la prueba testifical del caso y todos los compo-nentes que lo rodean.
En vista de ello, es norma reiterada que los foros apela-tivos no deben intervenir con la apreciación de la prueba y la determinación de daños que realice un tribunal de ins-tancia, salvo que ésta sea exageradamente alta o ridicula-mente baja. Sagardía de Jesús v. Hosp. Aux. Mutuo, 177 *930 D.P.R. 484, 509-510 (2009); Albino v. Ángel Martínez, Inc., 171 D.P.R. 457, 487 (2007).(2) Esta excepción es el estándar que ha regido en nuestra jurisdicción al momento de eva-luar las cuantías concedidas por un foro sentenciador.
Hace dos años, en Herrera, Rivera v. S.L.G. Ramírez-Vicéns, supra, nos dimos a la tarea de adoptar una meto-dología que permitiera dar una base más concreta a ese estándar. Como parte de esa metodología, reafirmamos nuestros pronunciamientos en cuanto a la utilidad de exa-minar las cuantías concedidas en casos anteriores, puesto que “constituyen un punto de partida”. Íd., pág. 785. Véase, además, Richard B. Capalli, Tort Damages in Puerto Rico, 46 (Núms. 1 — 2) Rev. Jur. U.P.R. 241, 295-300 (1977). Además de constituir un punto de partida, acudir a decisiones anteriores reduce el margen de arbitrariedad implícito en la valoración de un daño no pecuniario. Así lo reconocen José Julián Alvarez González y Luis Pellot Juliá al sostener: “Aunque es de rigor reconocer que atribuir un valor económico a aquello que no es objeto de transacciones de mercado es inicialmente arbitrario, hacer las atribucio-nes posteriores sin sujeción alguna a las ejecutorias pasa-das es doble arbitrariedad y expone a nuestro poder judicial a críticas basadas en suspicacia”. J.J. Alvarez González y L.M. Pellot Juliá, Responsabilidad civil extra-contractual, 81 Rev. Jur. U.P.R. 661, 676 (2012).(3)
Tras identificar casos anteriores similares y las cuan-tías concedidas en ellos, en Herrera, Rivera v. S.L.G. Ra-mírez-Vicéns, supra, expusimos que procedía ajustar estas cuantías al valor presente, tomando en consideración el *931 poder adquisitivo del dólar al momento en que se dictase la sentencia y, además, ajustar esa cantidad por motivo del crecimiento económico que pudo haber ocurrido entre la fecha del caso anterior y el presente. Íd., pág. 786. En otras palabras, adoptamos una metodología dual compuesta por el índice de inflación de la moneda y el índice de creci-miento económico. Como base para la metodología adop-tada utilizamos la obra del Lie. A.J. Amadeo-Murga, El valor de los daños en la responsabilidad civil, Ira ed., San Juan, Editorial Esmaco, 1997, Vols. 1-2.(4) En su más re-ciente versión del libro, de 2012, Amadeo-Murga expresa lo siguiente sobre nuestro proceder en Herrera, Rivera v. S.L.G. Ramírez-Vicéns:
La adopción definitiva de esta metodología [de ajustar las cuantías previas al valor presente] ha sido expuesta tan re-cientemente como el 25 de agosto de 2010 en [Herrera, Rivera v. S.L.G. Ramírez-Vicéns] en una clara y detallada opinión de nuestro Tribunal Supremo ... en la que considera que los fac-tores para juzgar si las cuantías se ajustan a la norma de exageradamente alta y ridiculamente baja son además de la evaluación de los daños concretos en casos específicos las cuantías concedidas anteriormente en casos similares que son útiles como parámetros para juzgar la razonabilidad de la ad-judicación bajo examen. Establece también que esta metodo-logía exige hacer un ajuste racional para considerar el valor de la moneda y finalmente de ser necesario considerar los cam-bios tecnológicos y económicos producto de una economía más avanzada y de mayor nivel de vida. Con esta opinión se esta-blecen pautas razonablemente claras que ayudan al juzgador de los daños a fijar éstos a base de criterios analíticos compa-rativos o factores necesarios para fijarlos de una manera justa. Amadeo-Murga, op. cit., 2da ed., pág. 28.
*932 Como ya dispusimos, el método adoptado en Herrera, Rivera v. S.L.G. Ramírez-Vicéns, supra, tiene dos compo-nentes: (1) considerar el poder adquisitivo del dólar al mo-mento en que se emitió la sentencia del caso previo y com-pararlo con su valor a la fecha del caso presente, y (2) realizar un ajuste adicional por el crecimiento de la econo-mía entre la fecha del caso modelo y la del caso presente. Evaluemos ambos componentes, comenzando por el segundo. Además, deseamos detenemos en la crítica que hace la Opinión mayoritaria al segundo componente de la fórmula anterior, puesto que con ella se abandona el pre-cedente judicial de Herrera, Rivera v. S.L.G. Ramírez-Vicéns al proponer que se descarte ese segundo paso.
La Opinión que suscribe una mayoría de este Tribunal sostiene que es innecesario el segundo componente de la fórmula (el ajuste por crecimiento económico) porque el ín-dice de Precios al Consumidor está actualizado con un año base (2006) más reciente y cercano al caso bajo estudio. Igual sugiere que se haga una revisión cada diez años, aunque es constatable que entre los años base 1984 y 2006 hubo un intervalo de veintidós años. Por lo tanto, la garan-tía de actualización decenal no nos consta. Partiendo de esto, la Opinión mayoritaria no se cuestiona cuál sería el escenario cuando entre el caso presente y el año base 2006 haya un intervalo de diez, quince o veinte años. Según la premisa que propone la Opinión mayoritaria, de ocurrir ese escenario, la víctima tendría que conformarse a una partida de daños utilizando un año base lejano y, peor aún, sin considerar siquiera los avances tecnológicos y económi-cos de una nueva economía. No podemos avalar este tipo de compensación que no se ajusta a la uniformidad, al fluir de la economía ni al sentido de justicia.
Además del argumento anterior, a la Opinión mayorita-ria parece incomodarle el segundo cómputo por razones muy discutibles. Para ello descansa en citar el reciente ar-tículo de revista jurídica de José Julián Alvarez González y *933 Luis Pellot Juliá para adoptar las críticas de éstos en torno a ese segundo componente de la fórmula. La Opinión cita de éstos que ajustar la compensación a base del creci-miento económico sólo tendría justificación si se concluyera que “la intensidad del sufrimiento moral aumenta según la sociedad progresa”. Alvarez González y Pellot Juliá, supra, pág. 677. Ante estas críticas, el licenciado Amadeo-Murga sostiene en la nueva edición de su obra:
La posición del Profesor Ronald Martínez Cuevas, de la cual se hace eco el Profesor José Julián Álvarez refleja una concep-ción errónea de lo que es el daño moral compensable. El daño moral compensable del caso de [Herrera, Rivera v. S.L.G. Ramírez-Vicéns] no se limita a las angustias físicas que éste puede haber sufrido como resultado de ser privado de un brazo. Ya hace tiempo nuestro Tribunal Supremo endosó el concepto de incapacidad como una partida del daño moral que es fundamentalmente la pérdida del goce de las actividades y placeres de la vida que en una sociedad donde hay mejor nivel de vida se han hecho mayores. ... Cuando una persona pierde por su incapacidad física la oportunidad de disfrutar, se ve privado de realizar una serie de actividades que enriquecían su vida. La compensación por daño moral incluyendo la capa-cidad en el disfrute de esas actividades sociales, culturales, sexuales y espirituales son mucho más amplias en una socie-dad de mayores bienes económicos, tecnológicos y culturales, que en una sociedad primitiva, agrícola o limitada. Por tanto, se debe traducir en una compensación económica que le dé valor a la privación de las actividades perdidas. ... En una sociedad más afluente donde las oportunidades educativas, re-creativas, sociales y culturales han aumentado, la pérdida de estas actividades crea un daño mayor. ...
... No hay controversia en que [las adjudicaciones de daños] deben ser ajustadas por inflación pero se ha reconocido que también es necesario ajustarlas al estado del desarrollo econó-mico y tecnológico de la sociedad en que se vive. Por tal razón las compensaciones por daño moral varían tanto en las socie-dades que tienen diferentes niveles de riqueza como en la misma sociedad en diferentes épocas de acuerdo a su desarro-llo económico real. Amadeo-Murga, op. cit., 2da ed., págs. 81-82.
Coincidimos y compartimos plenamente la posición ex-presada por el licenciado Amadeo-Murga.
*934 Siguiendo la línea de esa crítica de José Julián Álvarez González y Luis Pellot Juliá, la Opinión mayoritaria acoge la tesis de éstos y propone eliminar el segundo componente de la fórmula, para sólo usar el primero. Ahora bien, si aun así se considera deficiente la cuantía de daños a base de usar sólo el ajuste por inflación, la propuesta de los críticos mencionados y adoptada por el Tribunal es que se eleve en el caso presente esa cuantía para que se ajuste a las cir-cunstancias del caso. Álvarez González y Pellot Juliá, supra, págs. 678-679. El problema que plantea esa propuesta es que se retorna a la doble arbitrariedad histórica de la que hablamos anteriormente y sobre la que se ha criticado con vehemencia. Véanse: esc. 3 de esta Opinión; Álvarez González y Pellot Juliá, supra, pág. 676. Definitivamente, esa arbitrariedad, ambivalencia e incongruencia no la po-demos avalar.
Ese proceder, de cometer una segunda arbitrariedad histórica, lo vemos palpablemente en la Opinión mayoritaria. Se refleja con los tres casos resueltos previa-mente por este Tribunal y que la mayoría utiliza para va-lorar los daños de Jesús M. Rodríguez aplicando única-mente el ajuste por inflación.
Según la Opinión mayoritaria, en Colón v. Municipio de Guayama, 114 D.P.R. 193 (1983), los daños originales de la víctima fueron estimados en $25,000, que al aplicar la me-todología propuesta por la mayoría tendrían un valor pre-sente de $43,279. En Toro Aponte v. E.L.A., 142 D.P.R. 464 (1997), de unos daños estimados en $150,000, su valor pre-sente sería de $198,387. Y en Morales v. Hosp. Matilde Brenes, 102 D.P.R. 188 (1974), de $39,000 otorgados origi-nalmente, su valor actual sería de $109,032.
A pesar de que los valores actuales de esos tres casos modelos que propone la Opinión oscilan entre $43,279 a $198,387, la mayoría avala sin un ápice de discusión con-vincente la concesión de $500,000 para Jesús M. Rodríguez. Cómo la Opinión mayoritaria llega de esas tres *935 cifras a $500,000, no nos constan fundamentos plausibles. Lo más convincente es que la Opinión del Tribunal erró al cometer sus propias críticas: no darle certeza al estándar de “exageradamente alto o ridiculamente bajo” e incurrir en la arbitrariedad de la valoración de un daño. Nueva-mente, no podemos avalar estas conclusiones injustifica-das, cuando en nuestra jurisprudencia más reciente (Herrera, Rivera v. S.L.G. Ramírez-Vicéns) establecimos una pauta jurídicamente sensata que atendiera ese problema de estimación de daños.
Atendido lo relativo al segundo componente de la fór-mula adoptada en Herrera, Rivera v. S.L.G. Ramírez-Vicéns, supra, pasemos a evaluar el primero de éstos a la luz de nuevas propuestas que modifican esa fórmula.
El licenciado Amadeo-Murga reconoce que “[s]e pueden utilizar varias maneras para computar el relativo valor de la moneda. Amadeo-Murga, op. cit., 2da ed., pág. 70. En la primera edición de su libro se utilizó el índice de Precios al Consumidor (IPC), del cual se deriva el poder adquisitivo del dólar. (5) El IPC se define como “un indicador estadístico que mide, entre dos períodos específicos, el cambio relativo promedio ocurrido en los precios al por menor de las mer-caderías y servicios que consumen todas las familias en Puerto Rico”. Negociado de Estadísticas del Trabajo, De-partamento del Trabajo y Recursos Humanos de Puerto Rico, índice Oficial de Precios al Consumidor en Puerto Rico, Revisión 2010, 9 (17 de agosto de 2012), disponible en http://www.estadisticas.gobierno.pr/iepr/Estadisticas/ In-ventariodeEstadisticas/tabid/186/ctl/view — detail/mid/ 775/report — id/50c09c2a-f20e-4a5f—8438-665b88b4168d/ *936 Befault.aspx.(6) El poder adquisitivo del dólar, por otro lado, “se determina tomando como base el costo en dinero de las cosas esenciales para la vida, tales como los alquile-res, vestidos, alimentos y combustibles durante un período de tiempo determinado, para compararlo con el costo en dinero de esas mismas necesidades durante un período anterior de igual duración”. Rojas v. Maldonado, 68 D.P.R. 818, 830 (1948).
El IPC que se usó en Herrera, Rivera v. S.L.G. Ramírez-Vicéns, supra, como parte de la metodología propuesta por Amadeo-Murga utilizaba el año base de 1984. Tras una revisión de la canasta de bienes, se fijó el 2006 como el nuevo año base del IPC. Sin embargo, al detectarse defec-tos en algunas categorías de productos debido a problemas de sobrestimación en los cambios en precios, dejó de publi-carse el IPC. Véase Consultec, Nuevo Indice de Precios al Consumidor, Progreso Económico 3 (octubre 2010).(7) Tras una evaluación del método empleado para calcular el IPC, se hicieron “cambios metodológicos sustanciales que refle-jan grandes diferencias entre los estimados previos y los actuales”. íd. Véase, además, Amadeo-Murga, op. cit., 2da ed., pág. 71 (“El índice fue corregido porque se consideró que el nuevo índice de 2006 sobrestimaba la inflación considerablemente”). Posteriormente, se publicó un nuevo índice en septiembre de 2010 para subsanar los errores del anterior. Id.
Tras estos cambios, el licenciado Amadeo-Murga modi- *937 ficó la metodología adoptada en la primera versión de su libro, la misma que se utilizó en Herrera, Rivera v. S.L.G. Ramírez-Vicéns, supra. A tales efectos, señala:
Debido a la incertidumbre que nos crea el índice corregido, hemos consultado sobre la conveniencia de utilizar otro índice. Luego de consultas hemos decidido utilizar el índice que re-presenta el producto bruto per cápita por varias razones. No existe controversia en cuanto a su certeza, es publicado por la Junta de Planificación consistentemente y en este índice se recoge tanto el aumento por inflación como el aumento por el nivel de vida en uno solo, lo que hace más sencilla la operación del ajuste de compensaciones. El índice representa el conjunto de bienes y servicios producidos por los ciudadanos de Puerto Rico dividido entre el número de habitantes a precios corrientes. (Énfasis suplido). Amadeo-Murga, op. cit., 2da ed., pág. 72.
En otras palabras, “[a]l ajustar las compensaciones uti-lizando como índice único el producto bruto per cápita de Puerto Rico, estamos incluyendo tanto el aumento por in-flación como el aumento por nivel de vida entre el periodo comprendido entre el precedente y el año en que se va a fijar la compensación ante la consideración del tribunal”. (Énfa-sis suplido). Amadeo-Murga, op. cit., 2da ed., pág. 33. En resumen, la fórmula binaria incorporada a nuestro ordena-miento mediante Herrera, Rivera v. S.L.G. Ramírez-Vicéns, ahora sólo se modifica para simplificar el procedimiento.
Al adoptar esta nueva modificación propuesta por el li-cenciado Amadeo-Murga, sostenemos la filosofía detrás de nuestros pronunciamientos en Herrera, Rivera v. S.L.G. Ramírez-Vicéns: proveer una compensación más justa y uniforme al adoptar una fórmula que incluya tanto la in-flación de la moneda (a base del índice de precios al consu-midor) como el crecimiento en el estándar de vida (creci-miento económico).(8) Con este proceder se protege la *938 certeza judicial que debe caracterizar a nuestras decisio-nes, en ausencia de error manifiesto que violente la razón y la justicia. Capestany v. Capestany, supra, pág. 767.
No podemos avalar la postura de la Opinión mayorita-ria porque por un disgusto con la fórmula adoptada apenas hace dos años se pone en tela de juicio la certidumbre de nuestras decisiones. Esto no debería tener cabida en nues-tro ordenamiento jurídico, principalmente cuando la fór-mula ahora adoptada por la mayoría de este Tribunal es sólo una más de las distintas maneras en que los economis-tas calculan el relativo valor de la moneda, con el escollo de que esa fórmula, ahora acogida, no se ajusta a los valores jurídicos detrás de la estimación de un daño. Por el contra-rio, la fórmula de utilizar el índice de Producto Bruto per Cápita de Puerto Rico, que incluye en sí los aumentos de precios al consumidor más el aumento real en el incre-mento en el nivel de vida, se ajusta con mayor precisión a la filosofía del proceso de estimación de daños conforme a Herrera, Rivera v. S.L.G. Ramírez-Vicéns.
Nos sorprende sobremanera la aceptación expresa de la Opinión mayoritaria a los efectos de que “[e]s obvio que no hay consenso entre los expertos del tema sobre qué método utilizar para actualizar partidas concedidas en el pasado .... En esta opinión optamos por apegarnos a la que utiliza el índice de precios ... con las modificaciones señaladas, que también han avalado expertos y economistas”. (Enfa-sis suplido). Opinión mayoritaria, acápite IV, pág. 914. Se acepta que hay más de un método validado por expertos y economistas, pero se “opta” por “apegarse” ahora por otro método sin sujeción a lo establecido por este Tribunal. El *939 proceder de la mayoría de esta Curia parece transmitir el mensaje de que la deontología de los jueces de este Tribunal es tan sofisticada como cualquier acción cotidiana en donde "optamos” y nos “apegamos” por aquello que el mo-mento y el ánimo decidan.
Esa metodología adjudicativa es inaceptable. A la mayo-ría que suscribe la Opinión del Tribunal se le olvida “que nuestras opiniones son el resultado del estudio cuidadoso, ponderado e informado de la controversia que se nos pre-senta y de la norma que habremos de pautar”. Vázquez Vélez v. Caro Moreno, supra, pág. 988 (Rodríguez Rodrí-guez, J., voto particular disidente). Nuestras decisiones, como tribunal de más alta jerarquía que pauta Derecho, no pueden sostenerse en un “optamos” por algo distinto, cuando ya hay un precedente judicial reciente validado por expertos en la materia. Para justificar ese cambio, se debió demostrar primero el error manifiesto de la decisión anterior, cosa que nunca se hizo en la Opinión mayoritaria. Es impermisible que se estén revocando pronunciamientos de esta Curia por una mera insatisfacción con una norma co-rrecta y avalada por expertos.
Ante la ausencia de un error manifiesto que viole la ra-zón y la justicia en la metodología adoptada en Herrera, Rivera v. S.L.G. Ramírez-Vicéns, ahora modificada me-diante el uso del índice de Producto Bruto per Cápita de Puerto Rico, nuestro precedente judicial debe prevalecer para ser coherentes con nuestros pronunciamientos pasados.
IV
Evaluemos las concesiones de daños del caso de autos al amparo de la nueva fórmula: el índice de Producto Bruto per Cápita de Puerto Rico. El Tribunal de Primera Instan-cia otorgó las siguientes partidas de daños morales:
a. Jesús M. Rodríguez Rodríguez (víctima): $500,000
*940 b. Hilda R. Rodríguez Olavarría (madre): $225,000
c. Alejandro C. Rodríguez Ramos (padre): $225,000
d. Marisol Rodríguez Rodríguez (hermana): $50,000
e. Alejandro C. Rodríguez Rodríguez (hermano): $225,000
El Tribunal de Apelaciones las redujo a:
a. Jesús M. Rodríguez Rodríguez (víctima): $196,024.09
b. Hilda R. Rodríguez Olavarría (madre): $125,956.09
c. Alejandro C. Rodríguez Ramos (padre): $125,956.09
d. Marisol Rodríguez Rodríguez (hermana): $16,349.26
e. Alejandro C. Rodríguez Rodríguez (hermano): $75,000
En cuanto a Jesús M. Rodríguez Rodríguez (víctima), coincidimos con la Opinión mayoritaria en que el Tribunal de Apelaciones, al aplicar la metodología adoptada en Herrera, Rivera v. S.L.G. Ramírez-Vicéns usando como ejem-plo a Colón v. Municipio de Guayama, supra, erró en ajus-tar el valor de las partidas de daños anteriores al valor presente de la fecha en que se emitió sentencia. Su error consistió en utilizar el índice incorrecto del valor adquisi-tivo del dólar para el 1983.
Usando el 2006 como año base del índice de Precios al Consumidor y el caso modelo Colón v. Municipio de Gua-yama, la Opinión mayoritaria estimó que la partida de $25,000 en 1983, ajustada al valor presente equivaldría a $43,279. La Opinión concluyó ahí su proceso de ajustar al valor presente la cuantía de $25,000, ya que descartó el segundo componente de la fórmula adoptada por esta Curia: el ajuste por crecimiento económico.
Aparte de ese caso anterior, la Opinión del Tribunal comparó las compensaciones del caso de autos con otras dos anteriores. Tomó como ejemplo a Toro Aponte v. E.L.A., supra, donde se otorgó una compensación a la víctima de $150,000. Ese monto, ajustado al valor presente al mo-mento de dictar sentencia, usando sólo el primer compo-nente de la fórmula de Herrera, Rivera v. S.L.G. Ramírez- *941 Vicéns, equivaldría $198,387. El otro caso comparativo fue Morales v. Hosp. Matilde Brenes, supra, donde se otorgó la suma de $39,000. Ajustado al valor presente usando sólo el elemento del poder adquisitivo del dólar, serían unos $109,032.
Según expusimos, y en ánimos de continuar el prece-dente de Herrera, Rivera v. S.L.G. Ramírez-Vicéns, adopta-mos ahora la modificación de ajustar los valores previos al valor presente mediante el índice de Producto Bruto per Cápita de Puerto Rico. Si bien este índice se publica perió-dicamente por la Junta de Planificación, para facilitar el proceso usaremos las tablas que provee la nueva versión del libro de Amadeo-Murga. Amadeo-Murga, op. cit, 2da ed., págs. 93-95 (“Tabla IV. Producto Bruto Per Cápita en Puerto Rico a Precios Corrientes, Años 1947-2010”). La tabla en cuestión provee tres columnas: (1) el año, (2) el. pro-ducto bruto per cápita y (3) el porciento de aumento, usando como base el 2010.
La metodología que ahora adoptamos es más sencilla que la anterior. El cálculo es el siguiente: se multiplica el valor del daño del caso anterior (caso modelo) por el por-ciento de aumento (tercera columna) del año del caso modelo. Como la tercera columna aparece en términos por-centuales, el resultado de la multiplicación anterior debe dividirse entre 100. Lo resultante es el valor presente en dólares.
Examinemos ahora los tres casos modelos que utilizó la Opinión mayoritaria. Para ello, reproduciremos una tabla como la que aparece en el libro de Amadeo-Murga, pero sólo con los años de algunos casos modelos que discuti-remos.(9)
*942 ANO PRODUCTO BRUTO PER CAPITA DE AUMENTO 2010 = 100
1974 2,364 673
1983 3,947 403
1997 8,643 184 2009 15,825 100.6
2010 15,930 100
El monto en Colón v. Municipio de Guayama (1983) as-cendió a $25,000. Si multiplicamos dicha cantidad por el porciento de aumento para el año en que se resolvió ese caso, tenemos: 25,000 x 403% = 10075000. Eso lo dividimos entre 100 y equivale a $100,750.(10)
En Toro Aponte v. E.L.A. (1997) concedimos $150,000 en daños. Traído al valor presente según el índice de Producto Bruto per Cápita de Puerto Rico, tendríamos: 150,000 x 184% = 27600000. Dividido entre 100, el resultado al valor presente sería $276,000.
En Morales v. Hosp. Matilde Brenes (1974) se otorgó la suma de $39,000. Ajustado al valor presente usando la fór-mula anterior, equivaldría a: 39,000 x 673% = 26247000. Dividido entre 100, sería $262,470.
En Sagardía De Jesús v. Hosp. Aux. Mutuo, supra, este Tribunal validó la otorgación de $50,000 por daños sufridos por un infante por el lapso de veinticinco días. En aquel caso el foro de instancia calculó tal daño en dos mil dólares por día por veinticinco días, lo que sumaba a $50,000. Si-guiendo ese frío patrón, los 144 días de angustia de Jesús M. Rodríguez a razón de $2,000 equivaldrían a $288,000. Si bien reconocemos que nuestras expresiones en Sagardía De Jesús v. Hosp. Aux. Mutuo fueron que no es prudente hacer ese tipo de cálculo a base de días, acudimos a éste sólo como un ejemplo más y no en ánimos de que se con-vierta en una norma o práctica de nuestros tribunales de instancia. Sagardía De Jesús v. Hosp. Aux. Mutuo, supra, pág. 511 esc. 49.
*943 Anteriormente hemos reconocido que no existen casos exactamente iguales y que cada uno depende de sus pro-pias circunstancias al momento de valorizar los daños. S.L.G. v. F.W. Woolworth & Co., 143 D.P.R. 76, 81-82 (1997). A pesar de ello, como se mencionó, utilizar otros precedentes nos brinda una base que ayude a minimizar el campo de arbitrariedad en la otorgación de una partida de daños.
Si bien los casos modelos reseñados son muy útiles al valorizar los daños sufridos por Jesús M. Rodríguez, lo cierto es que ninguno de éstos contiene hechos exacta-mente iguales. Por ejemplo, en Colón v. Municipio de Gua-yama la víctima de 23 años sufrió un accidente producto del golpe de una plataforma de arrastre y diez días más tarde falleció. De la narración de hechos de ese caso se deduce que los dolores fueron intensos y angustiosos, pero es una realidad que sólo duraron diez días. Por el contra-rio, los de Jesús M. Rodríguez se extendieron por casi cinco meses y “[l]a cuantía de la valoración de dichas angustias físicas y mentales depende pues, del tiempo que sobrevivió la víctima y su estado de conciencia”. Amadeo-Murga, op. cit., 2da ed., págs. 181-183, citando a Colón v. Mun. de Guayama, supra. Igual sucede al comparar el caso de autos con Sagardía De Jesús v. Hosp. Aux. Mutuo, donde los da-ños del infante antes de morir se prolongaron sólo por vein-ticinco días en comparación con los de Jesús M. Rodríguez. (11)
Morales v. Hosp. Matilde Brenes y Toro Aponte v. E.L.A. son casos en donde, a pesar de los sufrimientos y padeci-mientos de cada víctima debido a la impericia médica, am-bas sobrevivieron, contrario a Jesús M. Rodríguez. Induda-blemente ese detalle debe tomarse en consideración al *944 momento de comparar jurisprudencia previa con el caso presente para otorgar una compensación justa.
Nos corresponde ahora evaluar los daños otorgados a Jesús M. Rodríguez vía sus herederos según el estándar de “exageradamente alto o ridiculamente bajo”, en compara-ción con los cuatro casos mencionados. Los ajustes al valor presente de esos casos, a los que hemos llegado siguiendo el índice de Producto Bruto per Cápita, oscilan entre $100,750 a $288,000. Por el contrario, como se acordará el lector, utilizando la fórmula incompleta de la Opinión ma-yoritaria los ajustes fluctuaban apenas entre $43,379 a $198,387, una cifra bastante lejana de los $500,000 que se confirmó. Esa brecha sin explicación de parte de la Opinión mayoritaria abre paso a la doble arbitrariedad histórica y “expone a nuestro poder judicial a críticas basadas en suspicacia”. Álvarez González y Pellot Juliá, supra, pág. 676.
Si bien es cierto que un principio cardinal de la práctica apelativa es otorgar deferencia al juzgador de los hechos en cuanto a la estimación de los daños, dicha deferencia no se puede sostener cuando lo otorgado sea exageradamente alto o ridiculamente bajo. Ahora bien, ante la imposibilidad de hallar una verdad transcendental en el lenguaje mis-mo, (12) y por ende no poder definir a ciencia cierta la frase “exageradamente alto o ridiculamente bajo”, nuestra juris-prudencia más reciente ha intentado fijar unos parámetros objetivos a dicha frase que limiten el campo o margen de la arbitrariedad judicial al fijar las partidas de daños.
Esos parámetros los esbozamos más recientemente en Herrera, Rivera v. S.L.G. Ramírez-Vicéns y son los que de-bemos adoptar en la presente controversia. Así, utilizando las partidas de daños de casos previos que analizamos, ajustadas al valor presente, no podemos confirmar la cuan-tía de $500,000 otorgada por el Tribunal de Primera Ins- *945 tancia por los daños sufridos por Jesús M. Rodríguez. Ésta, pues, se distancia considerablemente de las otorgadas en los casos examinados y no se justifica mediante el proceso metodológico que hemos adoptado como Tribunal.
Teniendo en cuenta que en los cuatro casos examinados las cuantías frecuentan cifras que rondan cerca de $300,000, debemos cuantificar el daño de la víctima del caso de autos a base de esas cifras. Partiendo, como ya mencionamos, que Jesús M. Rodríguez sufrió más días que las víctimas de los casos modelos y hasta falleció, estimamos que una cuantía jurídica y metodológicamente razonable por los daños de la víctima en este caso es de $350,000.(13)
Veamos ahora las cuantías otorgadas a Hilda R. Rodrí-guez Olavarría (madre) y a Alejandro C. Rodríguez Ramos (padre). A éstos se les otorgó individualmente $225,000.
En cuanto a los progenitores, la Opinión mayoritaria usó de precedente el caso de Hernández v. La Capital, 81 D.P.R. 1031 (1960), tal cual hizo el foro apelativo inter-medio. En ese caso se le otorgó a la madre de la niña falle-cida por indebida supervisión del hospital, la cantidad de $15,000 por sus propios daños. Aplicando sólo el primer componente de la metodología adoptada en Herrera, Rivera v. S.L.G. Ramírez-Vicéns, la Opinión del Tribunal ajusta esa cuantía al valor presente de $76,129.
Además de ese caso modelo, la Opinión citó el caso re-ciente de Sagardía De Jesús v. Hosp. Aux. Mutuo, supra, donde se le concedió al padre de la infante fallecida $400,000 y a la madre $350,000. (14) Incongruentemente con *946 la metodología usada para otros casos, la Opinión mayori-taria incrementa esas partidas de daños a $486,022 para el padre y a $364,516 para la madre. Véase esc. 13 de la pre-sente Opinión.
Evaluemos el escenario cuantitativo de estos dos casos al aplicarles el índice de Producto Bruto per Cápita. Nue-vamente, reproduciremos una tabla como la que aparece en el nuevo libro de Amadeo-Murga, pero con los años que deseamos examinar. (15)
ANO PRODUCTO BRUTO PER CÁPITA DE AUMENTO 2010 = 100
1960 716 2,182
1961 769 2,071
1971 1,908 836
2009 15,825 100.6
2010 15,930 100
Empezaremos por Hernández v. La Capital (1960) para ajustar el monto de $15,000 al valor actual. Siguiendo la misma fórmula que detallamos anteriormente, el resultado es el siguiente: 15,000 x 2,182% = 32730000. Dividido entre 100, aquella cifra de 1960 asciende a $327,000. Compárese ésta con la escasa suma de $76,129 que calculó la Opinión mayoritaria usando sólo el índice de inflación de la moneda. Claramente, eso no se ajusta a la realidad pre-sente de nuestra función de indemnizar la muerte de un hijo, particularmente cuando está presente un cuadro tác-tico tan revelador como el de autos. Por eso la necesidad de *947 adoptar la nueva modificación que propone Amadeo-Murga y que acogemos en esta Opinión, pues son una continua-ción de la manera más justa y uniforme que esta Curia optó en Herrera, Rivera v. S.L.G. Ramírez-Vicéns al valori-zar los daños no pecuniarios.
En cuanto a Sagardía De Jesús v. Hosp. Aux. Mutuo utilizaremos las mismas cifras otorgadas, puesto que se dictó el mismo año que la sentencia del caso de autos.
Para ampliar el espectro de casos precedentes que sir-van de modelo, utilizaremos a Ortiz Martínez v. Great American Indemnity Co., 83 D.P.R. 306 (1961), en donde un joven de diecisiete años falleció producto de un acci-dente en la carretera. A la madre le otorgaron $20,000, que ajustados al valor presente siguiendo el índice de Producto Bruto per Cápita, se traducen en $414,200. Al padre le asignaron $2,000, que se ajustan a $41,420. Por último, en Sánchez v. Liberty Mutual Ins. Co., 100 D.P.R. 1 (1971), también falleció una joven por accidente en la vía pública. En tal ocasión se le otorgó a la madre $25,000 y al padre $10,000. Ambas cifras se traducen en $209,000 y $83,600, respectivamente, siguiendo la misma fórmula anterior.
Entre estos cuatro casos, que ciertamente se diferencian del presente, las cuantías ajustadas varían entre $41,420 a $414,000. De éstos, en tres casos se otorgaron cuantías que ajustadas al valor presente sobrepasan los $325,000. Si bien el principio rector es que los tribunales apelativos no intervendremos con la discreción, apreciación y determina-ción de los daños de los tribunales de instancia, Velázquez Ortiz v. U.P.R., 128 D.P.R. 234, 236 (1991), al aplicar la metodología comparativa reseñada, estimamos que las partidas de $225,000 otorgadas a cada progenitor se apar-tan considerablemente de la mayoría de los casos examina-dos (se alejan por sobre cien mil dólares). Resultan, pues, injustificadamente bajas y habría que aumentarlas. íd. A base de los casos previos, de la evidencia examinada en el expediente del caso, del principio de mantener la uniformi- *948 dad en estos casos y del propósito de reducir el margen de arbitrariedad en las valorizaciones de daños, estimamos que las compensaciones de los progenitores debieron ser de $325,000 a cada uno.
Por último, veamos lo otorgado a los hermanos Marisol Rodríguez Rodríguez y Alejandro C. Rodríguez Rodríguez. El foro de instancia concedió a la hermana $50,000 y al hermano $225,000, lo que representa un aumento de 450% respecto de lo concedido a la hermana. En otras palabras, tras partir de la premisa de que los hermanos se encuen-tran en una misma posición con relación a Jesús M. Rodrí-guez, distinta a la de sus padres, el Tribunal de Primera Instancia concluyó que a base de la evidencia sometida el sufrimiento del hermano merecía un aumento de 450% en comparación con el sufrimiento de la hermana. Aparente-mente, el Tribunal de Apelaciones llegó a una conclusión similar, puesto que le otorgó al hermano $75,000, mientras que a la hermana $16,349.26. La cuantía otorgada al her-mano por el foro apelativo también significa aproximada-mente un incremento de 450% de lo concedido a la hermana.
La Opinión mayoritaria utilizó de caso modelo, al igual que el Tribunal de Apelaciones, el caso de Ortiz Martínez v. Great Ame. Ind. Co., supra, donde se le concedió a cada hermano la suma de $2,000. Tras aplicar sólo el índice de inflación, la Opinión estimó esa cuantía en $9,914 al valor presente de la sentencia. Además, la Opinión del Tribunal descansó en Velázquez Ortiz v. U.P.R., supra, en donde se aumentó lo concedido por el foro de instancia a $10,000 a cada hermano. Traído al valor presente según el método trunco que ahora decide usar la mayoría, esa cifra equivale a $14,731. Cómo la Opinión mayoritaria logra justificar la equiparación de esos valores a $50,000 y $225,000, resulta una incógnita que se asemeja a los tiempos previo a adop-tar una metodología más prudente, sensata, uniforme y menos arbitraria en Herrera, Rivera v. S.L.G. Ramírez-Vicéns.
*949 Siguiendo a Herrera, Rivera v. S.L.G. Ramírez-Vicéns y aplicando el índice de Producto Bruto per Cápita a los dos casos anteriores, vemos que las partidas concedidas por el foro de instancia no son exageradamente altas o ridicula-mente bajas. Situemos nuevamente una tabla con los índi-ces que facilita la nueva versión del libro de Amadeo-Murga:
ANO PRODUCTO BRUTO PER CÁPITA DE AUMENTO 2010 = 100
1961 769 2,071
1991 6,426 247
2010 15,930 100
Si usamos como ejemplo a Ortiz Martínez v. Great Ame. Ind. Co. (1961), la cifra de $2,000 multiplicada por 2,071% equivaldría al valor presente de $41,420. En cuanto a Ve-lázquez Ortiz v. U.P.R., los $10,000 otorgados en 1991 se traducirían en $24,700. Objetivamente, no hay una mar-cada diferencia entre estas cuantías y los $50,000 que el foro sentenciador otorgó a la hermana, Marisol Rodríguez Rodríguez. Ergo, debe confirmarse lo otorgado. Ahora bien, tanto el Tribunal de Primera Instancia como el Tribunal de Apelaciones entendieron que Alejandro C. Rodríguez Ro-dríguez había sufrido irnos daños morales mayores, razón por la que ambos foros otorgaron cifras mayores que a la hermana.
Según mencionamos al comenzar a discutir las cuantías otorgadas a los hermanos, la posición de éstos con relación a Jesús M. Rodríguez es distinta que la que ocupan los progenitores. Aunque no hay una ciencia cierta que con-cluya que el dolor de un padre o madre es incomparable al de un hermano, la sensatez humana nos llevan a ese pensar. Por ello, a pesar de que en el expediente obra evi-dencia sobre el dolor intenso del hermano, no podemos con-cluir que la cuantía a la que es acreedor deba ser igual a la de los progenitores.
*950 Nuevamente, debemos enfocarnos en reducir los márge-nes de arbitrariedad que rodean una valorización del daño moral. Así, partimos de los casos previos. Habiendo con-cluido que la adjudicación de $50,000 a la hermana es justa y razonable conforme a la jurisprudencia anterior, debemos aplicar un cálculo muy particular a esta controversia. Conforme comentamos, los foros inferiores estimaron que la cuantía que representara el sufrimiento del hermano debía ser 450% mayor que la de la hermana. (16) Si aplicamos ese mismo incremento porcentual a los $50,000 que ya validamos, tenemos que la cuantía a otor-gar a Alejandro C. Rodríguez Rodríguez debe ser de $225,000. No habiendo razones para concluir que el juez de instancia erró en su apreciación y valorización de los daños de los hermanos de Jesús M. Rodríguez, procede que con-firmemos ambas cuantías.
V
Finalmente, procede que revoquemos al Tribunal de Apelaciones por errar en la valoración de los daños. Así, estaríamos modificando las partidas concedidas por el Tribunal de Primera Instancia y confirmando sus determina-ciones. El resultado final según nuestra metodología sería el siguiente: Jesús M. Rodríguez Rodríguez, $350,000; Hilda R. Rodríguez Olavarría, $325,000; Alejandro C. Ro-dríguez Ramos, $325,000; Marisol Rodríguez Rodríguez, $50,000; y Alejandro C. Rodríguez Rodríguez, $225,000. El monto total de los daños que debieran pagar los codeman-dados, según nuestra metodología, asciende a $1,275,000; mientras que el monto total que sentenció el Tribunal de Primera Instancia, confirmado por la Opinión mayoritaria, asciende a $1,225,000. Tras analizar detenidamente las *951 circunstancias que rodearon este caso, entendemos que es más justo, equitativo y uniforme, con relación a nuestros precedentes, que se aplique la metodología de Herrera, Rivera v. S.L.G. Ramírez-Vicéns, que es la que adoptamos en esta Opinión disidente.
Por considerar que con la Opinión mayoritaria se atenta contra la estabilidad y solidez de nuestros pronunciamien-tos, máxime cuando no hay razón válida para cambiar nuestra norma anterior, disiento vehementemente del pro-ceder de la mayoría de este Tribunal.

 Véase también González v. Merck, 166 D.P.R. 659, 688 (2006) (Hernández Denton, J., Op. de conformidad), donde se comentó que al evaluar si es justificable o no aplicar la doctrina del precedente judicial se deben tomar en cuenta tres criterios: “(1) [si] la decisión anterior era claramente errónea; (2) [si] los efectos de la decisión sobre el resto del ordenamiento son adversos, y (3) [si] la cantidad de personas que confían en la decisión es limitada”.

 “Conceder cuantías insuficientes o ridiculamente bajas por concepto de daños sufridos a causa de actuaciones antijurídicas tiene el efecto práctico de aminorar la responsabilidad civil a la que deben estar sujetas dichas actuaciones. Por el contra-rio, una valoración exagerada daría lugar al elemento punitivo, ajeno a nuestro sis-tema de responsabilidad civil”. (Cita omitida). A.J. Amadeo-Murga, El valor de los daños en la responsabilidad civil, 2da ed., España, Bosch Editor, 2012, pág. 19.

 Indudablemente el punto de estos autores es que ante una arbitrariedad histórica al momento de fijar por primera vez en un caso una cuantía que indemnice un daño, será preferible acudir a ese caso originario con tal de evitar una doble arbitrariedad histórica en el tiempo presente.

 El valor incalculable del libro de Amadeo-Murga se ha reconocido desde hace años por su utilidad en la cuantificación de los daños y por las “valiosas tablas que permiten hacer la operación de traducir a valor presente una partida de daños con-cedida en el pasado”. (Enfasis suplido). J.J. Alvarez González, Responsabilidad civil extracontractual, 78 (Núm. 2) Rev. Jur. U.P.R. 457, 463 (2009). Resulta incoherente que la Opinión mayoritaria ampare su nueva postura en críticos que anteriormente han reconocido ese valor incalculable del libro de Amadeo-Murga en el ejercicio de actualizar al valor presente una partida de daños, para luego, al amparo de esos mismo críticos, descartar la fórmula propuesta y adoptada por esta Curia. Tal am-bivalencia injustificada de una mayoría de esta Curia es inaceptable.

 No olvidemos que además de calcular el poder adquisitivo del dólar al mo-mento presente, la fórmula propuesta por Amadeo-Murga en la primera edición de su libro para ajustar una cuantía concedida en un caso anterior debe incluir un ajuste por cambios tecnológicos y crecimiento económico producto de una economía más avanzada.

 Amadeo-Murga define el IPC más sencillamente así: “El índice de precios al consumidor está basado en los precios al consumidor de una canasta de bienes y servicios que consumen los ciudadanos del país y a base del promedio total de los bienes y servicios incluidos en esa canasta se determina el valor adquisitivo del dólar en ese momento”. A.J. Amadeo-Murga, 2da ed., España, Bosch Editor, 2012, pág. 70.

 Disponible en: http://www.popular.com/cs/Satellite?blobcol=urldata& blobheader=application®pdf&blobheadernamel=CacheControl&blobheadername2 =Expires&blobheadervaluel=max-age%3D3600&blobheadervalue2=Tue'+01+Jan+ 2013+04%3A00%3A00+GMT&blobkey=id&blobtable=MungoBlobs&blobwhere= 1234299534541&ssbinary=true# GA=Progreso_Econ_mico.

 Contrario a lo mencionado por la Opinión mayoritaria, en la presente Opi-nión no descartamos el precedente de este Foro en Herrera, Rivera v. S.L.G. Ramírez-Vicéns. Todo lo contrario, continuamos con la propuesta de aquel caso, pero mediante una fórmula más sencilla. Obsérvese que la modificación propuesta por el *938 licenciado Amadeo-Murga, y que adoptamos aquí, comprende utilizar el índice del Producto Bruto Per Cápita de Puerto Rico, que es otra “estadística oficial que reúnen los economistas”. Este, comenta dicho autor, incluye los dos componentes de la me-todología adoptada en Herrera, Rivera v. S.L.G. Ramírez-Vicéns: (1) el índice de precios al consumidor (IPC), de donde se deriva el poder adquisitivo del dólar, y (2) el crecimiento económico. Amadeo-Murga, op. cit, 2da ed., pág. 33. Si no avalamos la propuesta de la mayoría en la presente controversia, es precisamente porque se aleja injustificadamente de lo adoptado por esta Curia al abandonar el componente del crecimiento económico y utilizar sólo el índice de inflación de la moneda.

 Incluimos el 2010 por ser el año base.

 Otra forma de hacer el cálculo es multiplicar $25,000 por 4.03.

 También hay que tomar en consideración que “cuando el término de tiempo en que se sufren las angustias mentales antes de la muerte es relativamente corto, las compensaciones [otorgadas por el Tribunal Supremo] se han limitado considerablemente”. Amadeo-Murga, op. cit., 2da ed., pág. 185.

 Véase J. Derrida, Plato’s Pharmacy, en Dissemination (B. Johnson, trad.), Chicago, The University of Chicago Press, Í981.

 La diferencia entre las cifras de los casos modelos que rondan cerca de $300,000 y lo que concederíamos a Jesús M. Rodríguez no es exageradamente alta y se justifica con los sufrimientos particulares de la víctima en el caso de autos. Con-trástese esa diferencia con aquélla propuesta por la Opinión mayoritaria, que a base de su metodología trunca va desde casi $200,000 a $500,000. Esa diferencia de $300,000 en la Opinión del Tribunal abre la brecha para mayores especulaciones sobre la arbitrariedad judicial al fijar cuantías de daños.

 Yerra la Opinión mayoritaria cuando utiliza este caso para calcular las partidas de daños otorgadas a los padres de Jesús M. Rodríguez y en lugar de usar el *946 índice del valor adquisitivo del dólar para el 2009, utiliza el del 2004. La incongruen-cia de la mayoría estriba en que para los demás casos modelos se usó el índice del valor adquisitivo del dólar para el año en que este Tribunal resolvió el caso, mientras que en Sagardía de Jesús v. Hosp. Aux. Mutuo, 177 D.P.R. 484 (2009), se usó el año en que el foro de instancia dictó sentencia (2004). Véase, por ejemplo, Hernández v. La Capital, 81 D.P.R. 1031 (1960), donde la Opinión mayoritaria usó el índice de valor adquisitivo del dólar para 1960 (año en que esta Curia resolvió esa controver-sia), a diferencia de Sagardía De Jesús v. Hosp. Aux. Mutuo, resuelto en el 2009, pero donde se usó el índice del 2004. Ésta es otra más de las incongruencias que presenta la Opinión mayoritaria, razón por que la fiabilidad de la ponencia se ve minada.

 Incluimos el 2010 por ser el año base.

 No nos referimos aquí a que el hermano sufrió 450% más que la hermana, sino que la cuantía que representa ese sufrimiento debe contener una diferencia porcentual de 450%.